IN THE MATTER OF THE ESTATE OF BERNARD R. ARMOUR, DECEASED.

THE PRESIDENT AND DIRECTORS OF THE MANHATTAN COMPANY, GEORGE L. ARMOUR AND GEORGE F. LEWIS, AS EXECUTORS OF THE ESTATE OF BERNARD R. ARMOUR, DECEASED, AND GEORGE L. ARMOUR, INDIVIDUALLY, PLAINTIFFS-RESPONDENTS, v. MARTHA S. ARMOUR, AS GENERAL GUARDIAN FOR RUTH, RACHEL AND TOBY ARMOUR, DEFENDANT-APPELLANT, AND CARL E. SCHUSTAK AND OSCAR R. WILENSKY, FORMERLY APPEARING HEREIN AS GUARDIANS AD LITEM FOR RUTH, RACHEL AND TOBY ARMOUR, DEFENDANTS.

Argued September 30 and October 6, 1952—
Decided January 19, 1953.

Mr. *Anthony T. Augelli* argued the cause for appellant (*Mr. John Milton,* of counsel; *Messrs. Milton, McNulty & Augelli,* attorneys).

Mr. *Marshall Crowley* argued the cause for respondent George L. Armour, individually (*Mr. John A. Ackerman,* of counsel; *Messrs. Toner, Crowley & Ackerman,* attorneys).

*Messrs. James D. Carpenter and Elmer J. Bennett* submitted a brief on behalf of the respondent executors of the estate of Bernard R. Armour, deceased (*Messrs. Carpenter, Gilmour & Dwyer,* attorneys).

The opinion of the court was delivered by

HEHER, J. We have here a testamentary interpretative problem involving Article 12 of the will of the deceased Bernard R. Armour, in terms following:

"I hereby give my brother, George L. Armour, the privilege and right at any time within one (1) year from the date of my death to purchase all the shares of stock of American Aniline Products, Inc. which I may own at the time of my death, at a purchase price equal to the book value of said shares of stock, such book value to be determined by an inventory taken and a balance sheet struck at the end of the fiscal year of said corporation during which my death shall occur, and such book value to be determined without including any valuation whatsoever for patents, good will or other intangible assets of the said corporation. I direct my executors and trustees to sell the said shares of stock to my said brother upon such terms as my executors and trustees may, in their sole discretion determine in the event that he should, within the period of one (1) year after my death, elect to purchase the same.

Subject to the foregoing provisions of this Article Twelfth, it is my wish that my executors and trustees should continue to hold intact, so long as in their discretion it shall seem practicable or advantageous, my interests in the following companies: Heyden Chemical Corporation, American Aniline Products, Inc., Charles Hellmuth, Inc. and the Siegle Color Division of Ansbacher-Siegle Corporation, or any successor corporations, but in expressing this wish I do not desire to hamper or restrict my executors and trustees, in the exercise of their absolute discretion, in selling or otherwise disposing of any such interests at such time upon such terms as they may deem proper."

The testator died December 1, 1949. The will was executed February 24, 1944. It was drafted by a lawyer who is one of the executors. The testator's brother, George L., was named as a co-executor. At the time of the execution of the will, the testator owned and had registered in his name on the company's books 99,334 shares of the common capital stock of American Aniline Products, Inc. On October 18, 1946 he acquired five additional shares of the company's stock, and thereafter his holdings of the stock totalled 99,339 shares until July 12, 1948, when he transferred 99,000 shares to Sterling Chemicals, Inc., a body corporate organized October 31, 1945, whose entire issue of capital stock was owned by the testator, then and at all times thereafter until his death. On April 1, 1949 Sterling Chemicals, Inc. was merged with The Ore & Chemical Corporation, another body corporate wholly owned by the testator, under the corporate name and style of Sterling Chemical & Ore Corporation, whose entire outstanding capital stock remained in the testator's ownership until his death. The 99,000 shares of Aniline which on July 12, 1948 had been transferred to Sterling Chemicals, Inc. were by formal transfer made October 17, 1949 registered in the name of Sterling Chemical & Ore Corporation. At the time of the testator's death there were 99,719 shares of Aniline outstanding, of which 339 shares were registered in the testator's name and 99,000 shares in the name of Sterling Chemical & Ore Corporation. The certificate for the 99,000 Aniline shares issued in the name of the latter corporation was found December 28, 1949, unendorsed, in the testator's New York office safe. Prior to the merger Sterling Chemicals, Inc. had no securities other than the 99,000 shares of Aniline and it had no safe deposit box. The testator was its president. From the time of the merger Sterling Chemical & Ore Corporation possessed in its own right securities other than the Aniline stock, and had a safe deposit box. The testator was treasurer of this corporation. These corporations were separate and distinct entities employed to serve

the testator's varied business interests. Sterling Chemicals, Inc. and its successor corporation had their own assets other than the Aniline stock now in controversy, and their own liabilities. The business interests of the successor corporation were extensive; it owned and operated a plant at Newark, New Jersey, comprising 10 acres of land and 25 buildings.

When the will was executed, the testator and his wife were separated. There were three infant daughters of the marriage; they are parties to this suit represented by their mother as their general guardian. The testator had three sisters and one brother, George. There was a close brotherly tie between the testator and George. George for many years had been executive vice-president of Aniline, and devoted to the corporation's interests and his brother's affairs; and the testator had determined on George's succession to his entire interest in Aniline as it then was, consisting of all but a few of the outstanding shares of the capital stock, at the price provided by the formula embodied in the will.

The Superior Court concluded that "through his ownership of all of the outstanding stock of Sterling Ore & Chemical Corporation," the testator's "ownership" of the 99,000 shares of Aniline stock "standing in the name of that company was as complete and effective as it was when the will was drawn," and that the cited clause of the will was operative upon these shares of stock as if registered in the testator's name at the time of his death; also, that the term "intangible assets" contained in the price formula was used by testator in its "ordinary legal sense" to exclude consideration of "bank deposits, accounts receivable and investments in securities" in determining the book value of the stock in the event of the exercise of the option to purchase.

The validity of this construction constitutes the subject matter of the appeal.

 

## I.

The insistence is that by its very terms the option "to purchase all the shares of stock" of Aniline "which I may own at the time of my death" embraces only "the 339 shares which testator concededly owned at the time of his death and not the 99,000 shares then owned by Sterling Chemical & Ore Corporation."

The rationale of the argument is that the primary and natural significance of the words of the testamentary disposition, considered in the light of the context, is not inclusive of the shares which at the time of the testator's death were "owned by a corporation of which he was the sole stockholder," but only such shares as the testator then "owned, individually," and the surrounding circumstances do not warrant the broader construction.

There can be no doubt that this testamentary provision was designed to give the testator's brother George the option of buying, on the stated terms, practically the whole of the proprietorship in Aniline, represented by the shares of the corporate capital stock then registered in the testator's name. This in manifest recognition of George's devoted and fruitful service in the management of the large affairs and interests which were Aniline's, coupled with brotherly affection and concern for his continued well being.

It is equally clear that the testator did not have in mind, at the time of the making of the will, the curtailment before his death of his stockholdings in Aniline so as radically to modify the beneficial interest thus provided for George. The testamentary plan involves the continuance intact of Aniline and the other corporate enterprises controlled by the testator. It is established that the primary if not the sole aim of the transfer of the Aniline stock to the testator's wholly-owned corporation was the reduction of his tax liability, without thought or purpose of annulling in any wise the testamentary disposition thus made for the benefit of George.

The net income of Aniline had increased from approximately $430,000 in 1946 to $1,000,000 plus in 1947. The testator was then in the top income brackets, and he was apprehensive of income tax difficulties which later materialized. His tax indebtedness at the time of his death extended back to 1946. There was a deficiency assessment for 1946 of almost $42,000. Aniline's dividends in that year were $50,000. For the year 1947 there was a balance due for taxes of $185,000, plus a deficiency and an additional tax amounting to $28,500. The testator's Aniline dividends for that year were almost $100,000. In January 1948 he received a dividend from Aniline of nearly $250,000, and he knew that more would be forthcoming. He presented his problem to counsel, and the result was the transfer of the stock now in issue. Before the plan was consummated the Federal Treasury Department voiced the opinion that the transfer would be tax-free. There was testimony from counsel and officers of Sterling and Aniline that the stock was transferred solely to minimize the testator's income taxes. The testator offered no other reason. He, it was proved by the same witnesses, exercised full dominion and control of Sterling. A week after the transfer of the Aniline stock, a dividend of $1 per share was declared; and like dividends were provided in October and December 1948, aggregating $300,000, which under the stock transfer went into the treasury of the transferee corporation. Even without these dividends, the testator's personal income tax for 1948 was $500,000. To avert the apprehended danger of Sterling Chemicals, Inc. being considered "a personal holding company," it is said, that corporate body was consolidated with The Ore & Chemical Corporation, another wholly-owned corporation, to form Sterling Chemical & Ore Corporation, then and until his demise wholly owned by the testator. The testator was the directing genius of the corporation thus formed; his was the sole superintendency, largely without formal directorial authority, such as derives from ownership of the entire beneficial interest in the corporate property. It is fairly

deducible from the proofs that the testator retained in his personal possession the certificates for the Aniline stock while registered in the name of his wholly-owned corporation, before and after the merger. On his death the certificate for the shares was found in his personal safe, together with the certificates for shares of Aniline registered in his individual name and his stockholdings in other chemical companies.

Thus, it is established that the transfer of the Aniline stock was designed to minimize income taxes. So much seems to be conceded, or at least is not seriously disputed. But it is urged that the testator by this process also had in view the provision of means and facilities for acquiring an interest in another chemical corporation and the formulae and operating assets of other companies. We do not find ground for believing that this latter was a moving consideration; but even though there was this additional motivation, the dominant purpose was the avoidance of taxes by what was deemed to be a lawful measure, and, at all events, that circumstance would not be material, as we shall see.

The basic question is the essential quality and meaning of the testamentary disposition, assessed in relation to the surrounding circumstances. The appellant guardian insists that the word "own" signifies "individual ownership, as distinguished from something different such as a beneficial interest, or such as corporate ownership"; and thus she would make the restricted technical legal sense of the term alone the determinative of the testator's intention. By this construction, undue emphasis would be laid upon the strict letter of the phrase "own at the time of my death." Indeed, it is urged that this language is "entirely clear," and so there is "no room for construction," and the judge "should not have considered evidence of surrounding circumstances."

Although at the time of his death the testator did not hold the legal title to the stock, the beneficial enjoyment of the shares was his throughout, and the full beneficial inter-

est was within his complete and exclusive dominion and control, and at his absolute disposal as his own property, in virtue of his ownership of almost all the outstanding stock of the holding corporation, subject to the rights of third persons as against that corporation; and so until the end he undoubtedly considered himself the "owner" of the shares in the common, ordinary sense of the term, and the shares as within the testamentary provision in question. While the appellant guardian consistently in this view denies the applicability of the doctrine of ademption, the acceptance of the construction tendered by her would in effect annul the testamentary option as it was conceived by the testator at the time of the execution of the will. It would give to the transfer of the stock a character and incidence plainly at variance with the object the testator then had in view.

If it be said that the purpose to be served by the transfer suggests a complete divestiture of title, and it would not be effective as a tax-saving device unless that were so, it is nonetheless the fact that the testator's ownership of the subject matter remained unaltered in essence though changed in form. Whatever its status for tax purposes, the transfer in substance constituted a retention of the beneficial interest in the property and its use and enjoyment through the corporate device as distinguished from the conventional trust relation; and it is the substance of the transaction that determines its relevance and legal consequences on this inquiry as to the testamentary intention.

The evidence of the motivation for the transfer of the Aniline stock was admissible, not necessarily as indicative in itself of the testatorial intention at the time of the making of the will, but rather to prove the continuance of the ownership which the testator had in view when he made the will.

An instrument executed *animo testandi* becomes effective at the death of the testator. The testatorial intention is that which finds expression in the will itself, read and evaluated in relation to the attendant circumstances.

*In re Goldfaden,* 7 *N. J.* 450 (1951) ; *In re Fox,* 4 *N. J.* 587 (1950) ; *In re Fisler,* 133 *N. J. Eq.* 421 (*E. & A.* 1943) ; *Griscom v. Evens,* 40 *N. J. L.* 402 (*Sup. Ct.* 1878), affirmed 42 *N. J. L.* 579 (*E. & A.* 1880). And needless to say, in the very nature of the inquiry the relevant circumstances are such only as exist when the will is made, and are known to the testator. Although a will is for some purposes regarded as speaking from the death, the rule is not applicable to its construction. *Gray v. Hattersley,* 50 *N. J. Eq.* 206 (*Ch.* 1892) ; *Henderson v. Henderson,* 77 *N. J. Eq.* 317 (*Ch.* 1910).

 Here, the testator was at the time of his death the owner of the subject matter within the intendment of the testamentary option. The transfer of the shares did not constitute a loss of the ownership contemplated by the operative terms of the option, but merely a change in the mode and manner by which the testator exercised dominion over the subject property. While the legal title did not reside in the testator at the time of his death, the substantive ownership was his. He had full control of the corporation in which the legal title reposed, and the sole ultimate beneficial ownership of the corporate property as the holder of all but a few shares of the outstanding corporate capital stock; and the testatorial intention will be effectuated through the control thus exercisable by the executor as the testator's successor in interest. *Latorraca v. Latorraca,* 132 *N. J. Eq.* 40 (*Ch.* 1942), affirmed 133 *N. J. Eq.* 298 (*E. & A.* 1943) ; *Fidelity Union Trust Co. v. Roest,* 113 *N. J. Eq.* 368 (*Ch.* 1933). To hold otherwise would be to attribute to the transfer of the shares a quality and legal consequence plainly not within the contemplation of the testator, and do violence to his intention. The principle of ademption has no application. It is not a case of extinction of the subject matter of a testamentary disposition, or an implied revocation of the provision by a change of circumstances, which latter does not constitute ademption, strictly.

## II.

It is urged that, even so, the judge erroneously interpreted and applied the testamentary purchase-price formula of book value determined by an inventory and balance sheet "without including any valuation whatsoever for patents, good will or other intangible assets."

The judge conceived that the "difference of opinion" among the parties as to the meaning of the words " 'intangible assets' as used by the testator strongly suggests the existence of a latent ambiguity," and "to resolve that ambiguity" he admitted extrinsic evidence in the form of a declaration of intention and understanding said to have been made by the testator, and then read the phrase as inclusive of "cash in banks and on hand" amounting to $1,003,320.97; accounts receivable aggregating $377,542.01; securities, including investments in securities of wholly-owned subsidiary companies, totalling $188,025; and good will in the sum of $188,526.22—all this according to Aniline's unconsolidated balance sheet of December 31, 1949. The balance sheet did not include patents among the company's assets; for aught that appears, there were none.

It is elementary principle in the construction of wills that the controlling consideration is the effect of the words as actually written rather than the actual intention of the testator independently of the written words. The question is not what the testator actually intended, or what he was minded to say, but rather the meaning of the terms chosen to state the testamentary purpose; and all the rules of construction and permissible extrinsic evidence are in aid of the fulfillment of the intention reasonably comprehended in the words, and are governed accordingly; their operative force is confined by the basic statutory requirement that a testamentary disposition be in writing and attested by witnesses. *Griscom v. Evens,* cited *supra; Paul v. Paul,* 99 *N. J. Eq.* 498 (*Ch.* 1926). Yet the words are to be assessed in the light of the surrounding facts and circumstances;

and extrinsic evidence is admissible in nature and degree sufficient to place the judicial interpretive authority in the place of the testator at the time of the making of the will, the better to discover the true sense of the words, and to uncover and resolve ambiguity, but not to import into the will an intention alien to the expression. *Dahmer v. Wensler,* 350 *Ill.* 23, 182 *N. E.* 799, 94 *A. L. R.* 1 (*Sup. Ct.* 1932).

In common intent, the phrase "other intangible assets" is not inclusive of all intangibles as distinguished from corporeal property, for if that were the design and purpose, then there would be no reason whatever for the antecedent enumeration of patents and good will, in their very nature exclusive of current fixed assets such as bank deposits, accounts receivable, and securities. Such is the normal grammatical significance and intrinsic force of the words. The general terms are limited by the particular; the generic sense, by the restrictive words in association. Intention is mental action culminating in a formulated design revealed by words; and we are bound to assume that all the words play a significant part, according to their normal usage, in outlining the concept intended to be conveyed to the understanding of others.

 It is fairly to be presumed that specific mention would have been made of bank deposits, accounts receivable, and securities, very substantial assets constituting an integral part of the corporate financial structure, if the testator had intended to exclude them in determining the book value of the stock, rather than leave that purpose to the uncertain implication of a general clause. Why enumerate patents and good will alone, if the testator had in view current assets of the former class, such as are first in mind when corporate assets are under consideration? Certainly, we cannot ignore the natural significance of the particular words, in searching for the thought communicated by the whole of the expression. Vagueness and uncertainty are not to be expected in affairs of such moment, especially where, as here, the will gives a mere option to purchase and the price affects to a

very substantial degree the interest of the testator's three children in the residuary estate. Compare *Dahmer v. Wensler*, cited *supra*. Words are tokens of intention; and they are effective only as they delineate the testatorial design with reasonable certainty.

This is an apt case for the application of the maxim *noscitur a sociis* and the corollary rule of *ejusdem generis*, embodying the principle grounded in grammar, logic and reason that associated words and phrases may be looked to for the significance of doubtful words, and where general words follow particular words, in an enumeration describing the subject, the general words are construed to embrace only objects similar in nature to those enumerated by the antecedent specific words. The word "other" will generally be read as "other such like," so as to restrict the meaning of the general terms to those *ejusdem generis*, and thereby to give effect both to the particular and the general words. The particular words are treated as indicating the class, and the general words as comprehending all embraced in the class although not specifically enumerated. The antecedent special words are essentially restrictive; otherwise, they would have no meaning. *Camden Safe Deposit and Trust Co. v. Cape May Illuminating Co.*, 102 *N. J. Eq.* 351 (*Ch.* 1928).

*Ejusdem generis* means, literally, "of the same kind." It is an ancient doctrine, going back to the *Archbishop of Canterbury's Case*, 2 *Co. Rep.* 46a, 76 *Eng. Reprint* 519 (1596), designed to reconcile specific and general words, incompatible when considered in the abstract, in keeping with the canon of interpretation that none of the words used are to be deemed superfluous and all are to be rendered effective, if possible, so as to advance the true testatorial intention. If the general words are to have their natural meaning, in the abstract, then the antecedent particularization would be utterly vain, for the general class would encompass the particular enumeration. In legal science it is deemed but fair to conclude that if the testator had employed the general words in their unrestricted sense, he would have made no

mention of the particular, but, as was said in a case involving a legislative act, would have used but "one compendious" expression. *Rex v. Walton,* 5 *T. R.* 375, 101 *Eng. Reprint* 210 (1793). If the testator had in view the whole category of intangibles, then why the particular description? A statute providing that "no tradesman, artificer, workman or other person whatsoever" shall do any work or labor on Sunday was held inapplicable to farm laborers. *Rex v. Inhabitants of Whitmarsh,* 7 *B. & C.* 596, 108 *Eng. Reprint* 845 (1827). See, also, *Curtis & Hill Gravel and Sand Co. v. State Highway Commission,* 91 *N. J. Eq.* 421 (*Ch.* 1920), and the cases therein cited.

The maxim is grounded in those principles of universal acceptance directed to the effectuation of the intention of the maker of the instrument. It is applicable, like other rules of grammar, whenever a construction has to be put upon a will, statute, or agreement; and although difficulty frequently arises in applying it, yet this results from the particular facts of the individual case. The exposition of every will must be founded on the whole instrument, and be made *ex antecedentibus et consequentibus fit optima interpretario*; and therefore, "in this department of legal investigation, the maxim *noscitur a sociis* is necessarily of frequent practical application." *Broom's Legal Maxims* (9th ed.), 374, 375. "The best interpretation is made from antecedents and consequents," so runs the rule of construction.

Here, the specific enumeration constitutes a class; and the particular words do not exhaust the genus, unlike the case of *Hersh v. Rosensohn,* 125 *N. J. Eq.* 1 (*Ch.* 1939), affirmed 127 *N. J. Eq.* 21 (*E. & A.* 1940). The converse of the latter may not be affirmed of the nonownership of "trademarks, tradenames, copyrights, formulas, processes and the like" when the will was made. There might well be such ownership when the time came for determining the book value of the stock under the option. Indeed, there were no patents among the corporate intangibles when the testator

died; and there is no showing of such possessions when the will was executed.

The things enumerated in the subject clause and the corporate bank deposits, accounts receivable, and securities, are sufficiently diverse in character to constitute different classes. The latter categories comprise current assets more akin for all practical purposes to the tangible rather than the intangible, and so considered in the corporation's accounting practices. For instance, cash on hand and in bank were treated as one. While there are technical differences, bank deposits are made for safety and convenience in disbursement, and for corporate purposes they are the same. The words "other intangible assets" denote other assets *ejusdem generis* with those before specified. There is no contextual manifestation of an intention *contra*. Quite the contrary, considering the value of the estate, the tax burden, and the testator's recognized duty to his three children. The subject matter does not involve an absolute gift but rather an option to purchase the corporate business and property represented by the shares of stock; and the provision for the exclusion of assets in determining the book value of the stock is to be given a reasonable construction in keeping with the letter and spirit of the terms used, assessed in the light of the whole instrument and the attendant circumstances. The restricted use of the general words suggested by the rule of *ejusdem generis* is a compelling inference. This interpretive principle would have little or no practical utility or force were it not operative in these circumstances.

In *Funk & Wagnall's New Standard Dictionary of the English Language* (1941), under the heading "assets," the term "intangible assets" is thus defined: "Assets * * * Intangible a. (Finance) such values as accrue to a going business as goodwill, trademarks, copyrights, franchises, or the like." The 1951 edition of this dictionary has the same definition. And in the *American College Dictionary (Random House, 1949 ed.)*, under the heading "intangible" there is this definition: "3. (of an asset) existing only in con-

nection with something else, as the goodwill of a business." This definition has judicial recognition. *Plaut v. Smith*, 82 *F. Supp.* 42 (*D. Ct. Conn.*, 1949), affirmed *sub nom. Plaut v. Munford*, 188 *F. 2d* 543 (*C. C. A.* 2, 1951); *Minoff v. Margetts*, 14 *N. J. Super.* 30 (*App. Div.* 1951), certif. denied 7 *N. J.* 584 (1951). The term "intangible" is defined thus by Webster: "Intangible. n. Anything intangible; specific., an asset which is not corporeal, as good will, a patent right, etc." *Webster's New International Dictionary (2nd ed.)*.

And, as indicative of the testator's understanding of the terms used to express his intention, we have the following circumstances: Aniline's accountants treated as "current assets" on the company's balance sheets items such as cash in banks and accounts receivable. And the testator, himself, used the term "tangible assets" as inclusive of "current assets," and "current assets" as comprising cash in banks, accounts receivable, and securities. In certificates signed by him attesting certain changes in the stock structure of the Heyden Chemical Corporation, one of his affiliate enterprises (Exhibits D–11 and D–12), the term "tangible assets" is defined as fixed assets plus current assets and other investments and receivables and other tangible assets; and the term "current assets," as comprehending cash on hand and in solvent banks, readily marketable securities, and accounts receivable. The different classification in the corporate excise return made by the testator for Aniline to the State of Massachusetts in 1943 (Exhibit P–5), does not have countervailing significance. That classification was in accordance with the demands of a printed form submitted by Massachusetts which Aniline was not at liberty to vary. And, as just said, Aniline's balance sheets invariably combined cash in bank and on hand in the single classification of "cash in banks or on hand."

The hearing judge arbitrarily lifted the term "other intangible assets" out of context and accorded to it the absolute and all-embracive generic meaning, and as such deemed it the conclusive token of intention irrespective of

the qualification inherent in the associated words. But the judge was aided in this by testimony adduced from the scrivener that the testator had made oral declarations indicative of the intention so found.

The scrivener testified, over objection, that he called the testator's attention to the holding of a New York case involving the Heyden Chemical Corporation, decided in 1928, that "cash in the bank would not be a tangible asset, and therefore would be intangible assets. And he said, 'It is Okay, George.'" This conversation was had with the testator "prior to his signing the will." The witness, who was a stockholder of Aniline, and its general counsel, and also one of the executors of the will, conceded that the testator was familiar with Aniline's accounting practice and procedure of classifying under the heading "current assets," in the schedule of assets, "cash in bank, investments, accounts receivables, inventory"; and land and building under "fixed assets," followed by good will. He continued:

"Q. Is it now your statement to this Court that Mr. Armour intended to convey to his brother the right—to give to his brother an option to purchase this stock without paying anything for the current assets, cash in bank, accounts receivable, and securities? A. That is what I assumed was his intention, from the conversation. Q. And that is why you drew the will the way you did? A. That is why I drew this will the way I did. Q. Now, did you give any consideration to saying, 'Exclusive of cash in bank, investments, and accounts receivables'? A. I did not."

The cited New York case (*People ex rel. Heyden Chemical Co. of America, Inc. v. Law*, 249 *N. Y.* 193, 163 *N. E.* 558 (*Ct. App.* 1928)) considered a statute which excluded from its definition of "tangible personal property" money, deposits in bank, shares of stock, bonds, notes, credits or evidences of an interest in property and evidences of debt. Yet that would not be of critical importance on this inquiry, if the evidence were otherwise competent and relevant. The question then would be, what was the testator told, and what was the resulting understanding at the time of the exe-

cution of the will? As to this, the time of the conversation was not given except that it was "prior" to the testamentary act. We doubt that the proof thus adduced, although entirely credible, has the quality of definiteness and certainty requisite to sustain the inference of the testator's understanding and intention drawn by the judge. Although credible, it is not sufficient. But there is no need to pursue the subject. The evidence was incompetent as evincing a testamentary purpose not expressed in the will.

The question posed is to be resolved by construction, and not by an extrinsic search for the testatorial intention. It is elementary that the testator's intention is to be collected from the words of the will. As we have seen, it is ordained by statute that wills shall be in writing and attested by witnesses; and it follows that the testamentary intention cannot rest in parol, either in whole or in part. *R. S.* 3:2–3. "Wills are made by testators, not by witnesses." *Thomas v. Houston,* 181 *N. C.* 91, 106 *S. E.* 466 *(Sup. Ct.* 1921).

Parol evidence of an intention independent of that reasonably conveyed by the terms of the will obviously has no virtue as a medium of interpretation, nor is it receivable in proof of the actual intention in substitution for the written expression. The policy of the statutory direction that wills be in writing and executed according to the prescribed formalities as a protection against fraud peremptorily forbids parol testamentary dispositions under the guise of construction. The attendant circumstances known to the testator at the time are adducible to place the interpretive authority in the situation of the testator, such, for example, as the nature and extent of the testator's property, the natural objects of his bounty, and his contemplated beneficiaries, and thus to shed light upon the meaning of the words of the will; but extrinsic evidence is not admissible to establish a testatorial intention or understanding not embodied in the will itself.

The terms of the testamentary expression may be elucidated but not varied, enlarged, or contradicted by ex-

trinsic evidence. The question is not what the testator meant to express, but what the words do express, read in relation to the surrounding circumstances and the canons in aid of interpretation. The inquiry is not what the testator intended to have done, "but what the words of the clause mean, after applying to it the established rules of construction." *Evens v. Griscom*, 42 *N. J. L.* 579 (*E. & A.* 1880), Beasley, C. J., for the Court of Errors and Appeals. "No difficulty, however great, in deciphering the obscure language of the devise, or in unraveling the intricacies in the testator's descriptions of the person or property to which his testamentary disposition should apply, will justify resort" to extrinsic evidence. *Griscom v. Evens*, 40 *N. J. L.* 402 (*Sup. Ct.* 1878), Depue, J., for the old Supreme Court. "While full force should be given to the intent of the testator, yet that intent must be gathered by the application of known rules of construction and interpretation, established by oft-repeated and long-standing adjudications." *Tuerk v. Schueler*, 71 *N. J. L.* 331 (*E. & A.* 1904); *Wills v. Wills*, 72 *N. J. Eq.* 782 (*Ch.* 1907), affirmed 73 *N. J. Eq.* 733 (*E. & A.* 1908). To the same effect: *Camden Safe Deposit and Trust Co. v. Scott*, 121 *N. J. Eq.* 366 (*E. & A.* 1937).

At common law, declarations of the testator may be invoked to clarify a latent ambiguity, but not to resolve a patent ambiguity. This is an ancient rule in aid of construction; it does not open the door to the introduction of evidence of an intention independent of that expressed in the writing. An uncertainty arising from the words of the will or other instrument is patent; but latent where the doubt arises not upon the words themselves, but from some extrinsic or collateral matter. A latent ambiguity "is where the words of a written instrument are plain and intelligible, but by reason of extraneous facts, the certain and definite application of those words is found impracticable." *Hand v. Hoffman*, 8 *N. J. L.* 71 (*Sup. Ct.* 1825). Where there is simply a question of construction, to ascertain the meaning of the testator in the language he has employed, it should

be done from the will itself *ex visceribus testamenti*; the inquiry is whether "the parol evidence would contradict, or vary, the just construction of the will, as drawn from its terms"; if so, it is "manifestly inadmissible, as tending to produce an effect not permitted to be wrought by parol"; if it "corresponds with that construction it is inadmissible, because it is of no use value." *Den ex dem. Cubberly v. Cubberly*, 12 *N. J. L.* 308 (*Sup. Ct.* 1831).

We turn to Lord Bacon for the historical distinction between latent and patent ambiguities, made in commenting on his twenty-third maxim:

"There be two sorts of ambiguities of words: the one is *ambiguitas patens*, and the other *latens*. *Patens* is that which appears to be ambiguous upon the deed or instrument; *latens* is that which seemeth certain and without ambiguity, for anything that appeareth upon the deed or instrument; but there is some collateral matter out of the deed that breedeth the ambiguity."

This, he said, was the standard which determined the admissibility of extrinsic evidence. In the words of Vice Chancellor Wigram:

"It is the incongruity or want of correspondence between the language and the facts which raises a latent ambiguity." *Wigram, Extrinsic Evidence in Aid of Interpretation of Wills* (*2nd Am. ed.*) p. 262.

 Latent ambiguities explainable by parol fall into two classes:

"First, where the description of the devisee or subject matter of devise is clear on the face of the will, but on inquiry it is found that the words describe two or more persons or things with equal accuracy, so, unless it can be shown, by extrinsic evidence, to which the testator intended his words to apply, the devise must fail for uncertainty; and second, where the description of the devise or of the devisee is correct in part and in part incorrect, as, where devisee's name is correctly given, but his residence, or some other circumstance descriptive of the person or thing, is incorrect." *Miller v. Travers*, 8 *Bing.* 244, 131 *Eng. Reprint* 395 (1832).

Parol evidence is inadmissible "unless it be to show a latent ambiguity, or to remove one,". i. e., "one which does not appear on the face of the will, but lies hidden in the person or thing or subject of which it treats. * * * The *ambiguitas patens* raise no question for a jury or for the aid of witnesses, but is one of pure legal construction for the court." *Nevius v. Martin*, 30 N. J. L. 465 (*Sup. Ct.* 1864). A latent ambiguity is discoverable only by extrinsic evidence, and it is removable by such evidence. *Hyatt v. Pugsley*, 23 *Barb.* (*N. Y.*) 285 (*Sup. Ct.* 1856), modified 33 *Barb.* 373 (*Sup. Ct.* 1861); *Walpole v. Cholmondeley* (1797) *T. R.* 138, 101 *Eng. Reprint* 897; *Pickering v. Pickering*, 50 N. H. 349 (*Sup. Jud. Ct.* 1870).

In *Clayton v. Lord Nugent*, 13 *Mees. & W.* 200, 153 *Eng. Reprint* 83 (1844), a card found after the testator's death was held inadmissible in evidence, as a declaration of the testator to show who were the persons meant to be designated in his will by the letters K., L., M., etc. Alderson, B., held this to be the case of a patent ambiguity, "in which according to all the authorities on this subject, parol evidence to explain the meaning of the will cannot legally be admitted." He continued:

"Where, on the other hand, the words of the will in themselves are plain and unambiguous, but they become ambiguous by the circumstance that there are two persons to each of whom the description applies, then *parol* evidence may be admitted also to remove the ambiguity so created; and that rule is a reasonable one. Now, in the present case, the testator has left his property to some persons whom he designates by the letters M., O., K., and others; but what persons he meant, at the time of making his will, to designate by those letters, it is impossible to guess."

He cited Wigram for this proposition: "To define that which is indefinite, is to make a material addition to the will."

This is basic principle, designed to maintain the integrity of the revealed intention. It obtains in New Jersey.

"The law of this state appears to be well settled, to the effect that in construing a will this court may entertain extrinsic evidence of the circumstances, situation and surroundings of the testator at the time the will was executed, to the end that the court may be placed as nearly as possible in the position of testator and thus better comprehend the meaning and application of the language used by him; but statements made by the testator touching his meaning and purpose cannot be entertained." *Hammel v. Barrett*, 79 *N. J. Eq.* 96 (*Ch.* 1910), affirmed 79 *N. J. Eq.* 217 (*E. & A.* 1911).

And in *Farnum v. Pennsylvania Co. for Insurance on Lives and Granting Annuities*, 87 *N. J. Eq.* 108 (*Ch.* 1916), affirmed 87 *N. J. Eq.* 652 (*E. & A.* 1917), Vice Chancellor Backes thus epitomized the rule and its underlying philosophy:

"Now, it may have been Mrs. Batterson's intention to execute the power, and it may have been her understanding that she had done so, but it is not our privilege to go beyond her testament for demonstrations. Parol evidence of a testator's declarations, or of representations made to him, tending to show his meaning and intention or understanding of his will, different from its legal significance and effect, has been uniformly rejected by the courts as incompetent. By law, wills must be in writing, signed and published by the testator in the presence of witnesses; and it would be inconsistent with that law to permit parol proof to be introduced to contradict, add to, or explain their contents. This principle requires an inflexible adherence to it, even if the consequence should be a partial, or even total, failure of the testator's intention. The formalities so carefully provided would be of no value; the statute itself would be virtually repealed, if when the written instrument is supposed not to express the clear intention of the testator, the deficiency may be supplied, and its mistakes corrected by extrinsic evidence. No principle connected with the law of wills is more firmly established or more familiar in its application than this; and it seems to have been acted upon by judges, of early and of later times as well, with a cordiality and steadiness, which shows how entirely it coincided with their own views. A firm adherence to the rule is necessary to avoid the consequences of the misapprehension of the witness, and the danger of offering temptation to perjury."

These principles have general acceptance.

"Although the circumstances existing and known to a testator when he made his will are admissible in evidence, * * * yet his declarations of what he intended by language used in his will are

inadmissible. \* \* \* The offers of proof did not refer to circumstances known to the testator or to his relations with the claimants, but referred to his interpretation of the words of his will, and his intention respecting the disposition of his property. Such evidence was clearly incompetent and was rightly excluded." *Calder v. Bryant*, 282 *Mass.* 231, 184 *N. E.* 440, 443, 94 *A. L. R.* 18 (*Sup. Jud. Ct.* 1933).

Evidence of the intention of a testator "separate and apart from that conveyed by the language of the will is not admissible for the purpose of interpreting the instrument. \* \* \* However clearly an intention not expressed in the will may be proved by extrinsic evidence, the rule of law requiring wills to be in writing stands as an insuperable barrier against carrying the intention thus proved into execution"; and while the words of the will are to be read in the light of the circumstances under which the will was made, the rule "is inflexible that, for the purpose of importing into the will an intention which is not there expressed, proof of surrounding circumstances is inadmissible." *Dahmer v. Wensler,* cited *supra* [350 *Ill.* 23, 182 *N. E.* 802].

In *Crocker v. Crocker*, 11 *Pick.* 252 (*Mass. Sup. Jud.* 1831), the principle was put in these words:

"It may serve as an illustration of this rule, to consider what would be the effect, should a testator declare formally, in presence of witnesses, that it was his intent and meaning, that a provision in his will should have a particular effect. If the declared intent were conformable to the will, it would be nugatory and immaterial; but if it altered or controlled the provisions of the will, it would be to make the bequest by parol, and to substitute a verbal in place of a written will, contrary to the express provision of the statute."

See, also, *Fairfield v. Lawson*, 50 *Conn.* 501 (*Sup. Ct. Err.* 1883). "Construction must come from the will and not the will from the construction." *Northern Trust Co. v. Perry*, 105 *Vt.* 524, 168 *A.* 710, 712, 94 *A. L. R.* 7 (*Sup. Ct.* 1933).

"A firm adherence to the rule is necessary to avoid the consequences of the misapprehension of the witness, and the danger of offering temptation to perjury." *Nevius v. Martin,*

cited *supra*. Such is the policy of the statute requiring that wills be in writing.

There is much greater danger in receiving parol evidence of expressions of a testator's intention than in the acceptance of parol evidence explanatory of contracts *inter vivos*. *Smith v. Holden*, 58 *Kan.* 535, 50 *Pac.* 447 (*Sup. Ct.* 1897); *Robinson v. Ramsey*, 161 *Ga.* 1, 129 *S. E.* 837 (*Sup. Ct.* 1925).

## III.

It is also assigned for error that the "book value" of Aniline's shares was determined from an "unconsolidated" rather than a "consolidated balance sheet" of the company.

The point seems to be that although the book value of the net assets of two wholly-owned subsidiaries of Aniline is roughly $380,000, the accepted unconsolidated balance sheet carries Aniline's investments in its subsidiaries at $150,000, or approximately $230,000 less than the book value of the subsidiaries' net assets, and shows a liability of approximately $38,000 owing by Aniline to one of the subsidiaries and an account receivable of $3,000 owing to it from the other subsidiary. It is said that the unconsolidated balance sheet "was especially prepared for use in this proceeding," and "is not the same as the balance sheets customarily prepared" for Aniline "by its accountants," and the consolidated balance sheets were submitted to the Bureau of Internal Revenue by the executors for the purpose of determining the value of the shares for estate tax purposes.

The argument is that the purchase price, computed as directed by the judgment under review, "would include no valuation for the actual book value of the subsidiaries' net assets and, in the lower court's view of intangible assets, would not even include any value for the $150,000 carried as" Aniline's investments in its subsidiaries, and, on the other hand, "the purchase price would reflect a credit to the purchaser of the $38,000 debt to one of the subsidiaries

while reflecting no charge to the purchaser for the $3,000 account receivable from the other subsidiary."

The contention *contra* is that the consolidated balance sheet embodies not only the consolidated balance sheet of Aniline and its two subsidiaries, but also the balance sheet of the parent company alone, and the data which appears in the unconsolidated balance sheet for 1949 is also included in the consolidated balance sheet for that years; and that since the price of the stock "was to be determined without any valuation of the patents, good will or other intangible assets" of Aniline, the balance sheet contemplated by the particular provision of the will is that of the parent corporation alone—the company whose stock is the subject of the option. This reasoning is, in part at least, rested upon the construction of the will which we hold to be unsound.

Since the price of the stock is to be redetermined in accordance with the principle herein enunciated, it suffices to point out that the will provides the "book value" shall be "determined by an inventory taken and a balance sheet struck at the end of the" corporate fiscal year of the testator's death, qualified as therein stated, and there must be substantial compliance with that provision. The will contemplates true book value as disclosed by the inventory taken and the balance sheet struck at the end of the fiscal year. Arbitrary exclusions or omissions alien to the reason and spirit of the formula prescribed by the will are inadmissible.

The judgment is affirmed and reversed in part according to the foregoing conclusions; and the cause is remanded for further proceedings conformably to the stated principles.

BURLING, J. (dissenting). I am in accord with the principles of law expressed in section II of the majority opinion. I find myself unable to concur in the application thereof by the majority of the court to the principal question involved in this case, namely the construction (considered in section I of the majority opinion) of that portion, Article 12, of the will which gives to George L. Armour "the

privilege and right at any time within one (1) year from the date of my death to purchase all the shares of American Aniline Products, Inc., which I may own at the time of my death \* \* \*." These words distinctly indicate direct and absolute personal ownership of shares of stock at the time of the testator's death. They do not import indirect or equitable ownership of the corporation through ownership of shares of stock in another corporation.

The admissible extrinsic evidence in this case supports the clear language of the will. It is obvious from the record that the testator understood the difference between personal and corporate ownership of shares of stock. Dealing in securities and stocks of corporations was a considerable activity in his life. He was a man of pronounced business acumen, learned in corporate organization and its germane language and effect.

It has been said that facts which occur after a will is executed cannot be considered in construing the will, "although some courts have considered the testator's failure to alter his will, where he knew of the happening of some event after its execution which might affect the disposition of the property, as indicative of his intent." 4 *Page on Wills* (*Lifetime ed.* 1941), *sec.* 1624, *pp.* 656–657. See also 5 *New Jersey Practice, Clapp, Wills and Administration* (1950), *sec.* 108, *pp.* 248–250; *West Jersey Trust Co. v. Hayday,* 124 *N. J. Eq.* 85, 87 (*Ch.* 1938), affirmed on the opinion of the former Court of Chancery 125 *N. J. Eq.* 90 (*E. & A.* 1939). *Cf. Blauvelt v. The Citizens Trust Co.,* 3 *N. J.* 545, 552–553 (1950). Granting that the transaction involving the testator's transfer of shares of Aniline to Sterling was not a fraudulent device to evade taxes, and there is no evidence of fraudulent intent, the testator must have been aware of the principle of law that thereafter he was not the owner of the Aniline shares and that the Sterling corporation did not hold those shares for his personal use but rather to the corporate use. *Cf. Frank v. Frank's Inc.,* 9 *N. J.* 218, 224 (1952). The testator being aware of the meaning of the

plain words used in his will, it is reasonable to infer he would have altered that instrument had he originally intended a disposition opposed thereto. Article 12 of the will should be construed according to the plain import of the express terms used therein.

With respect to portion III of the majority opinion I concur in the result attained, namely that the consolidated balance sheet be used. The applicable principles of law are expressed in section II of the majority opinion.

For the reasons herein expressed I would reverse the judgment of the Superior Court, Chancery Division, in its entirety.

OLIPHANT, J., joins in this dissent.

*For modification*—Justices HEHER, JACOBS and BRENNAN —3.

*For reversal*—Justices OLIPHANT and BURLING—2.