44 N.J. 1 (1965)
206 A.2d 865
IN THE MATTER OF THE ESTATE OF ALMA C. COOK, DECEASED.
ANNA J. WAGNER, EXECUTRIX, ETC., PLAINTIFF-RESPONDENT,
v.
VIOLA COOK, CLAIMANT, ETC., DEFENDANT-APPELLANT.
The Supreme Court of New Jersey.
Argued November 2, 1964.
Decided January 14, 1965.
*3 Mr. Sam Weiss argued the cause for the appellant (Mr. Nicholas Martini, attorney).
Mr. Mortimer L. Mahler argued the cause for the respondent.
*4 The opinion of the court was delivered by JACOBS, J.
The Appellate Division affirmed the trial court's determination that the appellant Viola Cook was not entitled to any share of the estate of the testatrix Alma C. Cook. We granted certification on the application of the appellant. 43 N.J. 126 (1964).
Andrew Cook died in 1946 leaving the bulk of his estate to his widow Alma C. Cook. Shortly thereafter Alma executed her will. After revoking any prior wills and directing that her debts be paid, she made a bequest in the third paragraph to her late husband's grandchildren with a proviso that if any of them predeceased her then his legacy "shall be cancelled" and shall become part of the residue of the estate. The fourth paragraph contained a bequest to her mother and father with a similar proviso that if they predeceased her then it shall be cancelled and become part of the residue. The fifth paragraph directed the payment of taxes and the sixth paragraph read as follows:
"I do hereby give, devise and bequeath all of the rest, residue and remainder of my property, be it real, personal or mixed, and wheresoever it may be situate at the time of my decease, to my sister, Anna J. Wagner of the City of New York, County and State of New York, and my step-son, Raymond W. Cook of the Borough of Brooklyn, County of Kings and State of New York, their heirs and assigns, share and share alike."
Raymond W. Cook was the son of Andrew Cook and the stepson of Alma. He married Viola in 1950. Viola had known him for many years and was always on friendly terms with both Andrew and Alma Cook. Raymond and Viola lived together until Raymond's death in 1952. After Raymond's death, Viola continued to be on friendly terms with Alma who often displayed interest in her health and financial condition. While Raymond was alive he and Viola knew about the residual bequest to him. His stepmother had stated to him that since she had received the estate of his father she felt under obligation to provide for him. After Raymond's death, Alma stated that she felt under obligation to provide *5 for Viola as Raymond's widow and heir and that she had done so by the will she had executed. Alma knew that Viola was employed at a salary of $55 per week and that she was having difficulty maintaining her apartment and herself; she often questioned Viola as to her financial situation and told her that she would share in her estate as Raymond's widow and heir.
Alma died on September 2, 1961 and on September 27, 1961 letters testamentary were issued to her sister Anna J. Wagner as executrix. Anna and her attorney clearly considered that Viola, as sole heir of Raymond, was entitled to one-half of the residual estate. Anna's attorney kept Viola and her attorney advised as to the progress being made in settling the estate and as to the probable size of Viola's share of the residue. In December 1961, Anna's attorney advised that Viola would of course receive under the will, one-half of the residue "after the payment of administration costs, funeral expenses, etc." In 1962 there was much additional correspondence while a waiver was being awaited from New Jersey's Inheritance Tax Bureau. Ultimately the Bureau wrote a letter stating no waiver was necessary and that Raymond's interest in the estate had lapsed. At this point, Anna's attorney filed a complaint seeking a construction of the sixth paragraph of the will. An order to show cause was issued and an answer on Viola's behalf was filed along with a detailed affidavit embodying the facts set forth in this opinion. No counter-affidavit of any nature was filed and the parties agreed that the proceeding should be disposed of as though there had been cross-motions "for summary judgment"; undoubtedly they intended that it should be finally determined as if the matters set forth in the affidavit had been presented in regular course at hearing or trial.
In a letter opinion, the trial court held that the residual bequest to Raymond had lapsed and that his share went to Anna J. Wagner, the other residual legatee, rather than to Viola Cook, his widow and heir. It found the anti-lapse provisions of N.J.S. 3A:3-13 to be inapplicable since that *6 statute was not broad enough to extend to instances where, as here, the bequest was to a stepson rather than a son. See Haake v. Closter National Bank & Trust Co., 129 N.J. Eq. 72, 73 (Ch. 1941). It also determined that no "contrary intention" appeared by the will and that consequently Raymond's share was to vest in Anna J. Wagner under the terms of N.J.S. 3A:3-14. On appeal, the Appellate Division agreed that N.J.S. 3A:3-13 was inapplicable not only because Raymond was a stepson rather than a son but also because there had been no children born of his marriage. It voiced the opinion that the will, though considered in the light of the relevant extrinsic circumstances (Fidelity Union Trust Co. v. Robert, 36 N.J. 561, 564-568 (1962)), could not be construed as expressing an intention against a lapse of Raymond's residuary bequest.
In Robert we had recent occasion to restate the general principles which apply in the interpretation of wills. The court will read the testament in the light of all of the surrounding facts and circumstances and will strain towards carrying out the testator's probable intent. 36 N.J., at pp. 564-566. So far as the situation fairly permits, it will ascribe to the testator those impulses which are common to human nature and will construe his testament so as to effectuate those impulses. 36 N.J., at p. 565; Greene v. Schmurak, 39 N.J. Super. 392, 400 (App. Div.), certif. denied, 21 N.J. 469 (1956). Though direct statements by the testator as to his intentions are still being excluded by most courts, other utterances by him which may bear on the construction of his will are sensibly being received more and more freely by the courts. 36 N.J., at p. 566; 5 N.J. Practice (Clapp, Wills and Administration) §§ 196, at p. 299, 197, at p. 307 (3d ed. 1962). Not only may the circumstances surrounding the execution of the will be admitted but so also may the circumstances from then on until the testator's death. See West Jersey Trust Co. v. Hayday, 124 N.J. Eq. 85, 87 (Ch. 1938), aff'd 125 N.J. Eq. 90 (E. & A. 1939). And not only may the testator's practical construction of his will be received in evidence *7 but so also may the practical construction by the other interested parties. Cf. 5 Clapp, supra, § 204; Annot., 67 A.L.R. 1272 (1930).
At common law a legacy lapsed if the legatee predeceased the testator except where a proper construction of the will disclosed that the testator intended a gift over. See 6 Page on Wills § 50.2, at p. 62 (1962). Ordinarily a gift to A and his heirs was considered to have lapsed if A predeceased the testator because the word "heirs" was viewed as a word of limitation and not of substitution. See Zabriskie v. Huyler, 62 N.J. Eq. 697, 699 (Ch.), aff'd 64 N.J. Eq. 794 (E. & A. 1902). Nonetheless there were many instances in which it was found from the will and the surrounding circumstances that the use of the word "heirs" was intended to indicate the person or persons to whom the estate should go in the event the named legatee predeceased the testator. See Jackson v. Schultz, 38 Del. Ch. 332, 151 A.2d 284 (1959); In re Britt's Estate, 249 Wis. 30, 23 N.W.2d 498 (Sup. Ct. 1946); In re Burrows' Estate, 259 N.Y. 449, 182 N.E. 79 (Ct. App. 1932); Wettach v. Horn, 201 Pa. 201, 50 A. 1001 (Sup. Ct. 1902); cf. Gittings v. M'Dermott, 2 Myl. & K. 69, 139 Eng. Rep. 870 (1834); Den v. Manners, 20 N.J.L. 142 (Sup. Ct. 1843); Sandford v. Stagg, 106 N.J. Eq. 71 (Ch. 1930).
In Wettach v. Horn the testator made gifts to the heirs of his brother Thomas and his sister Elizabeth and a bequest of the residue of his estate to a deceased sister's daughter Margaret and her heirs. Margaret predeceased the testator. Her heirs were held entitled to the residue, the court finding that such was the intent of the testator and that to effectuate his intent the words "and her heirs" should be construed as words of purchase rather than limitation. 50 A., at pp. 1002-1003. In Burrows' Estate the testator directed his executors to divide the residue of his estate into three parts and to pay one part to his daughter-in-law, "her heirs and assigns." The daughter-in-law predeceased the testator, leaving children who survived him. In codicils drawn after the daughter-in-law's death, the testator referred to the fact that his will had *8 divided the residue of his estate into three parts and made certain supplemental provisions. The court found a clear intent on the part of the testator that his daughter-in-law's children take under his will "by right of substitution." 182 N.E., at p. 80.
In Jackson v. Schultz the testator's will left all of his property to his wife "and her heirs and assigns forever." His wife predeceased him, leaving children of a previous marriage. The evidence indicated that the testator always cared for the children and that he never intended that an uncle, who was his only blood relative at the time the will was executed and who later predeceased him, should share in his estate. The court held that the children took by right of substitution and relied on the many cases which have construed the word "and" to mean "or" when necessary to carry out the obvious testamentary design. 151 A.2d, at p. 285; see Hackensack Trust Co. v. Denniston, 127 N.J. Eq. 523, 528 (Ch. 1940); Kerrigan v. Tabb, 39 A. 701, 702 (N.J. Ch. 1898); 5 Clapp, supra, § 240; 4 Page, supra, § 30.23, at p. 147. It may be noted that courts have not only substituted words but have readily inserted omitted words when needed "to effectuate the manifest intent of a testator." Bottomley v. Bottomley, 134 N.J. Eq. 279, 291 (Ch. 1944). See Fidelity Union Trust Co. v. Robert, supra, 36 N.J., at p. 566.
In Britt's Estate the testator gave half of the residue of his estate "share and share alike" to his three brothers "being to each a one-third part thereof, to them and their heirs forever." The brothers predeceased the testator and the question presented was whether their shares lapsed or went to their heirs. In holding that they went to their heirs, the court found that such was the intention of the testator as "derived from the will as a whole construed in the light of the circumstances." 23 N.W.2d, at p. 499. In its opinion, the court first discussed In re Hoermann's Estate, 234 Wis. 130, 290 N.W. 608 (Sup. Ct. 1940), where a residual bequest to the testator's named children, share and share alike, and to their respective *9 heirs and assigns, was held to express words of purchase rather than limitation; it then had the following to say:
"* * * The use of the word `respective' in connection with the words `heirs and assigns' is treated as indicating that the gift is substitutionary at least in connection with the fact that the phrase to be construed occurs in a residuary clause. Some of the foregoing factors are not in this case. The clause in question, however, contains the phrase `share and share alike' and what amounts to the same thing, the phrase `being to each a one-third part thereof.' These words can usually have no possible meaning in view of their distributive character unless the gift to heirs is intended to be to them as purchasers. See Page on Wills, Lifetime Edition, Volume 3, page 329. See also Thomson v. Russell, 131 S.C. 529, 128 S.E. 421. In the Hoermann case we held that the circumstance that the residuary clause is being construed together with the natural presumption against intended intestacy leaves little more to be shown to warrant a conclusion that the heirs were intended to take by purchase. We consider that the words `share and share alike' are sufficient to constitute such a showing. We are fortified in this conclusion by a consideration of the surrounding circumstances, although these do give rise to conflicting inferences." 23 N.W.2d, at p. 500.
Similarly, in the case at hand, we are satisfied that when Alma's will is viewed, as it must be, in the light of all of the pertinent surrounding circumstances, it sufficiently evidences an intent that Raymond's heirs should take in the event he predeceased her. It must be borne in mind that almost immediately after Alma's husband died, leaving her the bulk of his estate, she executed her will dated July 3, 1946, in which she provided that most of her property be divided equally between her sister Anna and her late husband's son Raymond. While Raymond was not married at that time he was then courting Viola whom he later married. Alma and Viola were always friendly and it may fairly be assumed that when Alma decided to make the bequest to Raymond she contemplated not only Raymond but also his wife and family if he should have any. When her attorney drew her will he was clearly alert to the possibility that legatees might predecease the testatrix and undoubtedly intended to make the necessary provisions in this connection throughout the will. Thus, though our law would have taken *10 care of the matter in like fashion (5 Clapp, supra, § 402), he expressly stipulated in the third and fourth paragraphs that if any of the legatees named there predeceased the testatrix then the legacy shall be cancelled and go to the residue. When he dealt with the residue he did not say anything about cancellation but he did say that it shall go to Anna and Raymond, "their heirs and assigns, share and share alike." He presumably understood that this language, which was not necessary to establish a fee simple (N.J.S. 3A:3-15), was sufficiently substitutionary in nature for if it was not, there would have been, under the law as it then stood, a lapse and an intestacy as to half of the residue; it would appear evident that neither he, nor the testatrix when she read and signed the will, ever intended such a lapse and intestacy. Cf. 5 Clapp, supra, § 203, at pp. 330-331; In re Britt's Estate, supra, 23 N.W.2d, at p. 500.
In 1947 the Legislature enacted N.J.S. 3A:3-14 which states that where one of two or more residuary legatees predeceases the testator, his share shall not lapse but shall go to the remaining residuary legatees "unless a contrary intention shall appear by the will." This undoubtedly means by the will as construed in the light of the surrounding circumstances for there is nothing in the legislation to suggest any purpose to alter the rules of will construction as enunciated from time to time by the courts. And nothing in the legislation could affect any finding of the earlier intent of the testatrix as fairly gathered from the terms of the will and the circumstances surrounding its execution. As already indicated, such intent presumably was to give half the residuary estate to Raymond, and to his heirs if he predeceased the testatrix. The later happenings were confirmatory. When Raymond died Alma remained friendly with Viola, was solicitous of her welfare, knew of her financial situation, and made no alteration of her will. Cf. In re Long's Estate, 121 N.Y.S.2d 183, 186 (Surr. Ct. 1953); Levings v. Wood, 339 Ill. 11, 170 N.E. 767, 770 (Sup. Ct. 1930). Not only did her own practical construction of the will favor Viola but *11 so also did the practical construction by the only other interested party. Cf. 5 Clapp, supra, § 204; Annot., supra, 67 A.L.R. 1272.
Considering all of the foregoing, we conclude that the probable intent (Fidelity Union Trust Co. v. Robert, supra, 36 N.J., at pp. 564-566) of the testatrix was that the heirs of Raymond take his share in the event Raymond predeceased her and that her will may now fairly and justly be construed to carry out that intent. Accordingly, the judgment entered in the Appellate Division is:
Reversed.
HALL, J. (dissenting).
This court in late years has indicated a less confined approach in seeking to divine the intention of a testator where the testamentary language is unclear or its application not plain. Bank of New York v. Black, 26 N.J. 276 (1958), and Fidelity Union Trust Co. v. Robert, 36 N.J. 561 (1962), are illustrative. The whole document is now perhaps more minutely dissected and extrinsic evidence of surrounding circumstances, before and sometimes even after execution, more readily received. If doubt still remains, resolution is sought in the testator's "probable intention." 5 N.J. Practice (Clapp, Wills and Administration) § 196, at pp. 299-307 (3d ed. 1962).
The proper considerations involved in the judicial process of construction are aptly summarized in 3 Restatement, Property, § 241, comment c., pp. 1192-93 (1940):
"The dominant objective of construing a conveyance is to determine the disposition which the conveyor wanted to make. This depends upon an ascertainment of what may be termed his subjective intent, in so far as he had one. But there are difficulties in ascertaining subjective intent. In the first place subjective intent, although actually existent, is often inadequately evidenced by the behavior of the conveyor. In the second place, rules of policy, based upon the Statute of Frauds and the Statute of Wills, and rules of evidence designed to eliminate false testimony easy to fabricate and difficult to detect, prevent resort to some of the behavior of the conveyor as evidence of what has gone on in his mind. * * * In the third place, the conveyor very commonly has failed to envisage some of the possible combinations of future events, in the midst of which his disposition is to *12 take effect, and hence his subjective intent as to such future circumstances has been either non-existent or very hazy. Hence the judicial ascertainment of the intent of the conveyor is a process which combines an orderly, but somewhat restricted, search for his subjective intent with supplementing inferences of an intent which the conveyor probably would have had, if he had addressed his mind to those problems which, in fact, have arisen out of his conveyance."
A wider outlook and reliance on probable intention should never be permitted, however, to work out a will which a testator did not make. The overriding policy of the Statute of Wills prevents filling obvious gaps or changing clear provisions (see, e.g., Chrisman v. Cornell University, 1 N.J. Super. 486 (Ch. 1948); Vrooman v. Virgil, 81 N.J. Eq. 301, 310-311 (Ch. 1913)), to accord with what a court believes a testator thought he did or he would have or ought to have done, for the sake of "fairly and justly" reaching its idea of the proper result in a given case.
The judicial temptation to strain to the point of rupture by resort to probable intention is especially great in cases like this one  where in a family situation a principal beneficiary predeceases the testator and no express provision is made for that contingency. To my mind, the conclusion of the majority goes far beyond the legitimate limits of a most liberal approach to will construction and is fundamentally wrong, both as to the immediate result and from the standpoint of precedent. There is no ambiguity here; there is no doubt upon which any conception of probable intention can appropriately operate. It is simply a case where this testatrix, for one reason or another, had not provided at her death for the contingency which occurred some nine years previously.
When all is said and done, the majority conclusion actually has to rest on the thesis that the residuary disposition to the sister and the predeceasing stepson, "their heirs and assigns," meant him or his heirs, because the testatrix told the stepson's widow after his death that she had provided for her in the will.
It has been settled law in this State from time immemorial, as the majority concedes, that "heirs and assigns" and similar *13 technical expressions in wills denote words of limitation only  the title and tenure of the estate given  unless some special and different intended meaning can be gathered from the whole testament and surrounding circumstances. Zabriskie v. Huyler, 62 N.J. Eq. 697 (Ch. 1902), affirmed o.b. 64 N.J. Eq. 794 (E. & A. 1902); Haake v. Closter National Bank and Trust Co., 129 N.J. Eq. 72 (Ch. 1941); Lawes v. Lynch, 6 N.J. 1, 7 (1950). In the language of Vice-Chancellor Bigelow speaking to this particular phrase: "Add the word `assigns' to the term `heirs' and it is almost impossible to read the whole phrase otherwise than as a limitation." Fidelity Union Trust Co. v. Halsey, 136 N.J. Eq. 119, 121 (Ch. 1945). Although since 1784 (the act adopted in that year is now found in N.J.S. 3A:3-15) the use of the phrase is not necessary to pass an estate in fee simple, it is well known that many lawyers still incorporate it or similar expressions in residuary clauses or devises out of custom or an excess of care, as it is evident this attorney did. Invariably such use is in the technical sense with no other implication intended. If a testator asked his lawyer for an explanation of the language, he would undoubtedly be so told.
There is absolutely nothing elsewhere in this will or in the competent surrounding circumstances even to suggest the possibility of a substitutionary meaning for "heirs and assigns." The case thus differs substantially from those in other jurisdictions relied upon by the majority. Here, recourse is had to the scrivener's provision cancelling the money legacies in the event the legatee predeceased as indicating an intention to avoid lapse throughout the will and thus put substitutionary flesh on the technical bones of "heirs and assigns." To me, this is simply another hallmark of a cautious attorney, since there would be a lapse and falling into the residue as matter of law anyway. Perhaps it was even done at the request of his client who, as a layman, insisted it be made clear beyond question that no stepgrandchild was to receive more than $499 and that the residuary beneficiaries *14 and not other members of her family were to take the $1500 legacy to her parents if both of them predeceased her.
It is as clear to me as anything could be that an attorney so cautious would have unmistakably spelled out provisions to apply in the event either residuary beneficiary predeceased if the testatrix had wished or intended at the time to provide therefor. This seems particularly so because the will was executed before the enactment in 1947 of N.J.S. 3A:3-14 providing that the share of one of two or more residuary beneficiaries dying before the testator should not lapse but go to and vest in the remaining beneficiaries. When Alma Cook executed this will, her stepson was not even married. Besides the plaintiff, an unmarried sister, she had her father and mother, a married sister and a married brother. If either residuary beneficiary predeceased and the testatrix died before the 1947 statute was passed, the survivors of these family members would take that share in the proportions specified by the then laws of intestacy unless alternative provision was expressed. It is incredible that this careful attorney would not have explained this possibility to Mrs. Cook at the time. The only conclusion a court can reasonably and safely draw is that the testatrix was entirely willing that such should happen if either primary object of her bounty predeceased her or, as testators frequently do despite the urging of their lawyers, declined to make any further provision until some circumstance actually changed.
In considering the majority's view of the meaning of "heirs and assigns," it should also not be lost sight of that if the phrase has substitutionary meaning, it would have to be given the same meaning in the event the testatrix' sister had predeceased her. The substituted beneficiaries would then have been the heirs and next of kin of the testatrix, the other members of her family who would take anyway in the event of intestacy. This is further evidence to me that the phrase was used only in its usual technical sense.
So one is forced to conclude that the real basis for attributing substitutionary meaning to "heirs and assigns" can only *15 be the statements that the testatrix told the stepson's widow after his death that she had provided for her in the will. I had thought nothing was more unanimously settled than that such direct statements of a testator's intention are inadmissible. A recent clear holding is found in In re Armour's Estate, 11 N.J. 257, 277-284 (1953). Judge Clapp has put it this way:
"The reason for excluding the testator's direct statements of his intention is because the Wills Act has required the wishes of the testator to be integrated into a formal document, as a safeguard against fraud; and all statements of intention not reduced thereto, even if they are omitted by mistake, must be disregarded. So the court will not admit proof of the testator's instructions to his scrivener concerning the contents of the will, nor proof of his conversation with others on the same matter, nor evidence that the testator understood the will differently from the court's understanding of it, nor that a statement in the will was a mistake, nor that he intended to put in the will something that was not there, nor any other direct statement of his intention." (5 N.J. Practice (Clapp, Wills and Administration), § 197, at pp. 309-310).
See also 3 Restatement, Property, § 242, comment j, p. 1206 (1940).
The intrinsic soundness of the rule is well demonstrated here. The only proof of the statements is the most untrustworthy kind of hearsay  an ex parte affidavit setting forth the words of a deceased person recounted by the only party who stands to benefit therefrom. As the Appellate Division wisely said, even if they be taken as true, "* * * it is impossible to say now whether the statements from the testatrix to appellant were based upon a misconception of the legal effect of her will, were intended to be a promise to change the terms of the will, or indeed constituted only mere `puffing'" as we know occurs not infrequently to avoid unpleasantness or family disharmony while the testator still lives. The fact that no formal objection to the use of the affidavit appears to have been made on behalf of the plaintiff should not cause a different point of view, for it is evident the trial judge and plaintiff's counsel both considered the law so well settled against the use of such statements that it was simply assumed *16 they were to be excluded from consideration. See Zabriskie v. Huyler, supra (62 N.J. Eq., at p. 701), where Vice Chancellor Stevenson did exactly that. Indeed, the claimant's counsel, when pressed at oral argument before us, as much as conceded that the long established law would have to be changed drastically to permit consideration of his client's affidavit and that he had no real basis for success unless such were done.
True it is that the majority does not expressly upset the rule forbidding admission of direct statements of intention, but the effect is accomplished by considering them as the testatrix' "own practical construction" of her will. No pertinent authority is cited to ground any such novel theory and I am sure none exists. The policy and reasons requiring rejection remain the same.
Nor does the majority's result find any solid base in the fact that the plaintiff and her attorney at first took the position the claimant was entitled to half the residue. This attorney did not draw the will and the record contains no explanation of why he originally advised this view. I had always thought it elementary that a will cannot be construed by reference to the "understanding in the family," Vrooman v. Virgil, supra (81 N.J. Eq., at p. 311), and that one cannot lose his interest thereunder by anything less than conduct amounting to estoppel or waiver, Lawes v. Lynch, supra (6 N.J., at pp. 10-11).
In my view, the only proper conclusion here is that the testatrix just did not provide for the substitutionary devolution of her residuary estate and no amount of legitimate judicial construction can fill that gap. Correctly considered, the case is identical with Haake v. Closter National Bank and Trust Co., supra (129 N.J. Eq. 72) and Zabriskie v. Huyler, supra (62 N.J. Eq. 697), where stepchildren had also predeceased, and should go the same way unless violent disregard of thoroughly established and wise limitations on judicial will construction is to become the rule of this and many future days.
*17 I would affirm the judgment of the Appellate Division.
Justice Haneman joins in this opinion.
For reversal  Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR and SCHETTINO  5.
For affirmance  Justices HALL and HANEMAN  2.