LOUIS ENGLE, EXECUTOR UNDER THE WILL OF JUDITH
E. SIEGEL, DECEASED, RESPONDENT, v. LEO H.
SIEGEL AND JUDITH BARON, APPELLANTS, AND IDA
ENGLE, RESPONDENT.

LOUIS ENGLE, EXECUTOR UNDER THE WILL OF ALBERT
N. SIEGEL, DECEASED, RESPONDENT, v. LEO H.
SIEGEL AND JUDITH BARON, APPELLANTS, AND IDA
ENGLE, RESPONDENT.

Argued May 10, 1977—Decided August 3, 1977.

*Mr. Alfred C. Clapp,* argued the cause for appellants (*Messrs. Clapp and Eisenberg,* attorneys; *Mr. Clapp* of counsel).

*Mr. Saul J. Zucker* argued the cause for respondent (*Messrs. Zucker, Lowenstein, Gurny, Facher and Zucker*, attorneys; *Mr. Zucker*, on the brief).

The opinion of the court was delivered by

MOUNTAIN, J. The facts in this will construction case are not in dispute. In September, 1973, Albert and Judith Siegel, together with their two children, lost their lives as the result of a tragic hotel fire in Copenhagen, Denmark. All died within thirty days of one another. Albert's will was dated April 2, 1964 and Judith's was dated September 29, 1964. The instruments were admitted to probate October 3, 1973 and Louis Engle, Judith's father, qualified as executor of both. A common disaster clause appears in each will. The provision in Albert's will reads as follows:

In the event my wife JUDITH and my children predecease me, or [this is the event which occurred] if we all die as a result of a common accident, or within thirty (30) days from the date of my death, then in that event, I give, devise and bequeath all the rest, residue and remainder of my estate and property of every kind and nature unto my mother, ROSE SIEGEL, and my mother-in-law, IDA ENGLE, to be divided between them share and share alike.

The corresponding clause in Judith's will was identical except for appropriate alterations as to names and relationships. Rose Siegel, Albert's mother, predeceased her son and daughter-in-law, having died in or about 1967. Judith's mother, Ida Engle, survived and is a party to this action.

The contest has arisen due to the fact that Rose Siegel, named in each will as a residuary legatee, predeceased her son and daughter-in-law. Ida Engle, the other residuary legatee, takes the position that under these circumstances our statute, *N. J. S. A.* 3A:3–14, becomes operative to cause the entire residuary estate of each decedent to pass to her. This statute reads as follows:

When a residuary devise or bequest shall be made to 2 or more persons by the will of any testator dying after July 3, 1947, unless

a contrary intention shall appear by the will, the share of any such residuary devisees or legatees dying before the testator and not saved from lapse by section 3A:3-13 of this title, or not capable of taking effect because of any other circumstance or cause, shall go to and be vested in the remaining residuary devisee or legatee, if any there be, and if more than 1, then to the remaining residuary devisees or legatees in proportion to their respective shares in said residue.

[*N. J. S. A.* 3A:3-14]

Appellants, Leo H. Siegel and Judith Siegel Baron, are brother and sister of the decedent, Albert Siegel. All three, of course, are also children of the decedent, Rose. It is these appellants' position that the foregoing statute has no relevance here because, by a proper application of the rule of probable intent, the share of each residuary estate set apart for their mother, should now pass to them in equal shares. The trial court found in favor of Ida Engle and the Appellate Division affirmed. Both opinions are unpublished. We granted certification, 71 *N. J.* 527 (1976), and now reverse.

Traditionally, and perhaps rather monotonously, courts have repeated, as we do here again, that in construing the terms of a will, a court's task is always to determine the intent of the testator. But these words may be given different meanings and the quest for intent can be undertaken and pursued in various ways. The generally accepted method of determining testamentary intent was once described by this Court in these words,

It is elementary principle in the construction of wills that the controlling consideration is the effect of the words as actually written rather than the actual intention of the testator independently of the written words. The question is not what the testator actually intended, or what he was minded to say, but rather the meaning of the terms chosen to state the testamentary purpose. . . [*In re Armour*, 11 *N. J.* 257, 271 (1953)]

This statement can no longer be said accurately to express the law of our State.

In *Fidelity Union Trust Co. v. Robert,* 36 *N. J.* 561 (1962) this Court, speaking through Justice Jacobs, an-

nounced what has come to be known as the doctrine of probable intent. The rule has been stated thus,

While a court may not, of course, conjure up an interpretation or derive a missing testamentary provision out of the whole cloth, it may, on the basis of the entire will, competent extrinsic evidence and common human impulses strive reasonably to ascertain and carry out what the testator probably intended should be the disposition if the present situation developed. [*In re Estate of Burke*, 48 N. J. 50, 64 (1966)]

It must be clear that the quest for intent projected by this definition is something quite different from the more traditional approach set forth in *Armour*. In applying the new rule a court not only examines "the entire will" but also studies "competent extrinsic evidence"; it attributes to the testator "common human impulses" and seeks to find what he would *subjectively* have desired had he in fact actually addressed the contingency which has arisen. We are no longer limited simply to searching out the probable meaning intended by the words and phrases in the will. Relevant circumstances, including the testator's own expressions of intent, *Wilson v. Flowers*, 58 N. J. 250, 262–63 (1971), must also be studied, and their significance assayed. Within prescribed limits, guided primarily by the terms of the will, but also giving due weight to the other factors mentioned above, a court should strive to construe a testamentary instrument to achieve the result most consonant with the testator's "probable intent."

*Fidelity Union Trust Co. v. Robert, supra*, was shortly followed by *In re Estate of Cook*, 44 N. J. 1 (1965), which presented an issue very similar to that before us here. In *Cook* the will divided the residuary estate between the testatrix's sister and her stepson. The latter predeceased the testatrix. His wife, however, who was also his heir, survived the testatrix. The courts below held that there being no "contrary intention" appearing from the will, N. J. S. A. 3A:3–14 applied and the decedent's sister took the entire

residue. This Court reversed, again in an opinion written by Justice Jacobs. He pointed out that the will was to be read in the light of all surrounding facts and circumstances and that the court would "strain towards carrying out the testator's probable intent." 44 *N. J.* at 6. He also noted that the residuary gift to the testatrix's stepson had been followed by the words "his heirs and assigns." Reviewing all relevant facts bearing upon the relationship of the parties, together with such circumstances as tended to throw light upon the decedent's probable wishes, it was determined that her intent would be fulfilled by deeming the words "his heirs and assigns" to be words of purchase rather than of limitation. Hence it was concluded that the stepson's widow and heir was entitled to the share of the residue her deceased husband would have taken had he survived the testatrix. The decision is also notable in its refusal to apply the foregoing statute, pressed upon us here.

*Robert* and *Cook* were followed by *In re Estate of Morton,* 48 *N. J.* 42 (1966) and *In re Estate of Burke, supra,* 48 *N. J.* 50 (1966). Both opinions were written by Justice Hall. *Morton* is perhaps most significant with respect to our present inquiry in its insistence that the *entire* will, the *whole* testamentary scheme be studied and considered in the process of determining probable intent.

*Burke* presented a case where a life beneficiary outlived all designated remaindermen, a contingency not covered by the will. The question was whether the corpus of the trust from which the life beneficiary had been receiving income should pass by intestacy or pour over into two other subsisting trusts. The trial court had ruled in favor of intestacy. This Court applied the doctrine of probable intent, "to which [it] is now committed," 48 *N. J.* at 63, and ruled that the principal of the trust poured over into the other two trusts established under the will for the benefit of other branches of the family. Justice Hall observed that the positive search for probable intent "has particular significance in the case . . . of an unprovided for contingency causing a failure in

the complete disposition of the residue." 48 *N. J.* at 64. We face exactly this problem here. Finally Justice Hall asked the question as to what the testatrix would most probably have done had she in fact thought of and addressed the contingency which had actually occurred.

It seems clear to us that she would then have expressly provided for a pour over of the *corpus* of that third of her estate equally between the other two trusts upon the death of her daughter-in-law [life beneficiary].

[48 *N. J.* at 67]

We pause to emphasize the manner in which this decision was reached. First, a contingency for which no provision is made in the will was identified as having occurred. The family circumstances and the plan of testamentary disposition set forth in the will were then carefully studied. Finally the court placed itself in the position of the testatrix and decided how she would probably have responded to the contingency had she in fact envisoned its occurrence.

A search for probable intent was greatly facilitated by this Court's decision in *Wilson v. Flowers, supra,* 58 *N. J.* 250 (1971). There we held that direct statements made by the testator were admissible to show such intent. As Justice Proctor observed,

If our task is to ascertain and follow the testator's probable intent, we cannot fairly exclude evidence of that intent. [58 *N. J.* at 262]

It has been said that

[a]part from the cases in the Spiritual Courts, *Flowers* is the first decision in Anglo-American law authorizing the admission of a testator's direct statements of intention as to his will. [*Clapp, Justice Nathan L. Jacobs — The Doctrine of Probable Intent,* 28 *Rutg. L. Rev.* 251, 259 (1974)]

In considering *Flowers* it is also important to perceive the breadth of the ruling as to the admissibility of extrinsic testimony.

We do not, of course, mean to imply that such evidence [extrinsic] can be used to vary the terms of the will, but rather that *it should be admitted first to show if there is an ambiguity and second, if one exists, to shed light on the testator's actual intent.* [58 *N. J.* at 263; emphasis added]

As to the wide scope of this rule, note also the comments of Judge Lane in *In re Estate of Hays,* 128 *N. J. Super.* 460, 466 (Cty. Ct. 1974).

■ Respondents rely heavily upon *N. J. S. A.* 3A:3–14. It is important to consider the nature and purpose of this enactment. It is designed to avoid partial intestacy in those instances where one of several residuary legatees or devisees predeceases the testator and the will contains no limitation over in the event of such contingency. The statute rests upon the legislative judgment that under such circumstances a testator would normally prefer that the presumptive share of the beneficiary so dying should pass to other residuary legatees rather than devolve by intestate succession. It is important to realize fully that the act is in no way intended to preempt a testamentary plan that can be discerned by a search for probable intent. As Justice Jacobs observed in *Cook,*

[N]othing in the legislation [*N. J. S. A.* 3A:3–14] could affect **any** finding of the earlier intent of the testatrix as fairly gathered from the terms of the will and the circumstances surrounding its execution. [44 *N. J.* at 10]

Not until a quest for probable intent has proven fruitless, will there be any occasion to resort to the statute.

■ With these considerations in mind, we turn to the facts of this case.

We are satisfied that the death of Rose Siegel, prior to the tragic deaths of the testators, was a contingency not treated specifically in the wills and not actually foreseen or anticipated by the testators. That inference can be readily drawn from an examination of the wills in their entirety, noting especially the numerous provisions therein for gifts or bequests over to named legatees upon death or failure to

survive, indicating clearly enough that the testators were mindful of contingencies of this sort and did anticipate dispositions to be made where this occurred. The failure to make a similar provision in the event of the premature death of either mother, where to do so would be completely logical and in keeping with the tenor of the wills, must be ascribed to inadvertence. It is not to be inferred that that omission was purposeful or that, by implication, an intestacy was intended, or that a gift over by operation of the statute was desired. We thus have no hesitancy in concluding that one element justifying the quest for probable intent has been established in this case, namely, that there has indeed occurred a contingency not foreseen or anticipated when the wills were drafted.

We next turn to the relevant and competent extrinsic evidence which bears upon the probable intention of the testators with respect to this unforeseen situation. The attorney who drafted the will, Samuel J. Zucker, Esq., testified as to his conference with Albert and Judith Siegel preceding the drafting of the will. He testified from memory, aided by notes he had made at the conference. The question as to what disposition should be made of their assets in the event of a common disaster was squarely raised. After conferring together, Albert, speaking for his wife and himself, declared that in that event they would like all of their property to be divided equally between their two families. As Albert put it, "split it down the middle so they [the respective families] each get half . . ." Mr. Zucker pointed out that the word "family" was inappropriate as being "a broad term." The problem so posed by the attorney was obviously perceived as one of form or draftsmanship. Certainly, the attorney did not suggest that the Siegels should not provide for the persons constituting their "family." Nor can his advice to his clients be interpreted to mean that the Siegels were being told to designate an individual legatee rather than one standing in a representative capacity or an identifiable group or class of persons. The sense of this exchange between Mr.

Zucker and the Siegels is that, if it was their intention to benefit the class of persons constituting their respective families, that designation would have to be accomplished with more definite and precise language.

The Siegels, after again conferring together, suggested that, in the event then being considered, their property be equally divided between their respective mothers, Rose Siegel and Ida Engle. The will was, of course, drawn to reflect this decision.

We have no difficulty in reaching the conclusion that the primary wish of each decedent, given the contingency that occurred, would have been to divide the property included in their residuary estates between the Siegel family and the Engle family. The designation of their respective mothers resulted solely from the scrivener's rejection of the word "family" as a term to describe the recipient of a testamentary benefaction. Each mother was obviously thought of as an appropriate representative of a "family."

To give the assets of both estates entirely to Mrs. Engle would seem to fly directly in the face of all the evidence bearing upon probable intent. It is perhaps pertinent to note at this point that the assets constituting the estates of both Albert and Judith were derived almost entirely from Albert's earnings. Judith had no money that had come from her own family.

On the other hand, to divide one-half of each residuary estate equally between Leo H. Siegel and Judith Siegel Baron, now obviously the persons constituting the Siegel "family," would seem completely to carry out probable intent.

We do not adopt the suggestion that the "Siegel" share of the two estates should be deemed to pass through Rose's estate. Having predeceased her son and daughter-in-law she could hardly qualify as a recipient under their wills. We think rather, as stated above, that one-half of the residuary estate of Albert and one-half the residuary estate of Judith should be divided equally between Leo H.

Siegel and Judith Siegel Baron. The other shares of each estate will of course pass to Ida Engle.

The judgment of the Appellate Division is reversed and Louis Engle, as executor of each of the two wills, is directed, as soon as may be appropriate, to effect distribution of the assets of both estates pursuant to what we have said above.

SULLIVAN, J. (concurring in result). I agree with the result reached in the majority opinion but would not rest it on the doctrine of probable intent. To me, a proper construction of the written wills against the background of the undisputed facts and circumstances, leads me to the firm conclusion that the intent of the common disaster clause as it appears in each will was to divide each residuary estate equally between the two families. In other words, Rose Siegel and Ida Engle are mentioned as class or family representatives rather than individually.

Since Albert and Judith each intended and understood that the clause, as written, effected such a result, no change was made in the wills even though Rose died in 1967, some six years prior to the September 1973 tragedy. Therefore, construing the wills as written, I agree that the judgment of the Appellate Division should be reversed and that the residuary estates of Albert and Judith should be distributed one-half to Ida Engle and the other divided equally between Leo H. Siegel and Judith Siegel Baron.

CLIFFORD, J. (dissenting). Even with the decent burial given by the Court to *In re Armour*, 11 *N. J.* 257, 271 (1953), I think I would not consign to the decisional graveyard the following from that case:

The question is not what the testator actually intended, or what he was minded to say, but rather the meaning of the terms chosen to state the testamentary purpose * * *.

[*Id.* at 271.]

While this statement no longer carries the dogmatic weight it once did, it retains value as a rule of construction. In the construing of a will the basic statutory policy (*N. J. S. A.* 3A:3–1 *et seq.*) of allowing the instrument to speak for the testator as of the date of death must be accorded great respect. I understand the court's function to be to determine the testator's intent from the language employed in the will; only if an ambiguity is shown does the doctrine of probable intent as developed in *Fidelity Union v. Robert,* 36 *N. J.* 561 (1962), and its progeny allow extrinsic evidence to be utilized to construe the document.

Mindful of the difficulties which are often present in determining what is or what is not an ambiguity in any instrument, I nevertheless approach this case with the conviction that the doctrine of probable intent should not be used to *create* an ambiguity in a will which the doctrine will then be called upon to resolve. I am afraid that is exactly what is happening here.

As I understand the operation of the doctrine of probable intent, an ambiguity in the instrument is the condition which triggers the doctrine's application to change the result which would attend a literal application of the language of the will. *Wilson v. Flowers,* 58 *N. J.* 250, 263 (1971). An ambiguity is a "condition of admitting of two or more meanings, of being understood in more than one way, or of referring to two or more things at the same time * * *." *Webster's Third International Dictionary* (1961); *cf. Allen v. Metropolitan Life Ins. Co.,* 83 *N. J. Super.* 223, 237–38 (App. Div. 1964), rev'd on other grounds, 44 *N. J.* 294 (1965).

I am unable to discern, anymore than could the trial judge, (as he put it) "any uncertainties of expression [or] latent ambiguities of expression within the testamentary writing * * * which would authorize departure from the result prescribed by *N. J. S. A.* 3A:3–14." The problem as I see it is simply that the instrument omits the necessary language which would save from lapse a bequest to a pre-

deceased legatee. It is this crucial omission which distinguishes the case from *In re Cook,* 44 *N. J.* 1, 7 (1965), relied on by the majority. In *Cook, supra,* the "contrary intention" required by *N. J. S. A.* 3A:3–14 to save from lapse the bequest to the predeceased legatee was found in the language of the will directing the gift to the legatee and his "heirs and assigns". Similar language in the will under consideration would undoubtedly force a result in line with *Cook;* however, such language is not present and the "contrary intention" required by the statute is likewise absent.

It seems to me that this is the classic situation the legislature had in mind when it enacted *N. J. S. A.* 3A:3–14 and we should heed its direction rather than rewrite the testator's will. Having survived his mother by about 6 years, he had the opportunity to undertake that rewriting himself. The testator not having done so, I see no reason why this Court should gratuitously second guess him and perform that service.

SULLIVAN, J., concurring in the result.

*For reversal*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, SCHREIBER and HANDLER—6.

*For affirmance*—Justice CLIFFORD—1.