**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0250-15T4

IN THE MATTER OF THE
ESTATE OF CHARLES W.
WINTER, JR., DECEASED.

_____

Argued May 17, 2017 — Decided September 27, 2017

Before Judges Fuentes, Simonelli and Carroll.

On appeal from the Superior Court of New
Jersey, Chancery Division, Morris County,
Docket No. P-1610-2013.

Gabriel H. Halpern argued the cause for
appellant Michelle DiPaolo (PinilisHalpern,
LLP, attorneys; Mr. Halpern, of counsel and
on the briefs).

Lauren Wachtler (Mitchell Silberberg & Knupp
LLP) of the New York bar, admitted pro hac
vice, argued the cause for respondent Lorraine
Belmont (Riker, Danzig, Scherer, Hyland &
Perretti, LLP and Ms. Wachtler, attorneys;
Khaled J. Klele, of counsel; Ms. Wachtler, of
counsel and on the brief).

Jeremy B. Stein argued the cause for
respondent Mira Morrison (Hartmann Doherty
Rosa Berman Bulbulia, LLC, attorneys; Mr.
Stein, on the brief).

Harvey H. Gilbert argued the cause for
respondent Howard Steinberg (Mr. Gilbert,

attorney, joins in the brief of respondent Lorraine Belmont).

PER CURIAM

In this will contest, plaintiffs Michelle DiPaolo, Mary Beth Daly, Angelo Giudice, JoAnn Giudice, Philip Giudice, and Domenick Giudice (collectively plaintiffs), were cousins of the decedent, Charles W. Winter, Jr., and were named as residuary beneficiaries under his Last Will and Testament executed in 1999. Defendant Lorraine Belmont, Winter's cousin and residuary beneficiary under his will, shared a close family and personal relationship with him for more than sixty years until he died on June 13, 2013. Defendant Mira Morrison was Winter's girlfriend of more than thirty years until he died. Defendant Howard Steinberg was Winter's best friend since childhood and the two men worked together for many years.[1]

Winter executed a new will on February 7, 2013, which named Belmont, Morrison, and their family members and Steinberg as sole beneficiaries of his estate (the Will). Plaintiffs sought to invalidate the Will based on defendants' alleged undue influence over Winter. Plaintiffs appeal from two July 31, 2015 Chancery Division orders, granting summary judgment to defendants and dismissing the complaint with prejudice, and denying plaintiffs'

---

[1] We shall sometimes collectively refer to Belmont, Morrison, and Steinberg as defendants.

motion for leave to file an amended complaint to add additional claims. For the following reasons, we affirm both orders.

## I.

This Chancery case began in December 2013. There was extensive discovery over an eighteen-month period, which included numerous depositions, answers to interrogatories, and document production. We derive the following facts from that discovery as well as certifications and admissions in plaintiffs' response to Belmont's statement of facts.

Winter never married and had no children. In 1999, he executed a will designating his parents as beneficiaries of his estate and his thirteen cousins as residuary beneficiaries, including plaintiffs, Belmont, and Belmont's sister, JoAnn Belmont (JoAnn B.). Winter's parents died, leaving his cousins as the residuary beneficiaries under his will. After Winter's parents died, he discussed changing his will with his long-time friend and attorney, John J. Delaney, Jr., Esq. However, he did not change his will at that time.

In December 2012, Winter, then sixty-five years old, was hospitalized for what he believed was pneumonia. Defendants and JoAnn B. visited him in the hospital.

In January 2013, Winter learned his condition was not pneumonia, but rather terminal stage four lung cancer. He was

hospitalized periodically throughout the beginning of 2013, and defendants visited him in the hospital and helped him with his medical, personal, and financial needs. Plaintiffs never visited Winter in the hospital or assisted him in any way. They visited him only once in March 2013, at his home.

Winter was seriously ill and hospitalized on February 3, 2013. Defendants and JoAnn B. were present when Winter and Morrison called Delaney and asked him to come to the hospital to prepare a new will for Winter. Delaney was deposed and submitted a certification. He testified that he spoke directly with Winter on the telephone. Except for plaintiffs' self-serving assertions, there is no evidence supporting their statement in their merits brief that "[Morrison] was in a panic to call the lawyer" on February 3, 2013. In addition, plaintiffs do not support by reference to the record their statement that "as [Winter] appeared to be close to death, it was [Morrison] who started the mantra 'call the lawyer, call the lawyer.'" See R. 2:6-2(2)(5). To the contrary, when asked at his deposition whether he saw anyone suggest to Winter that he call Delaney, Steinberg testified: "No. [Winter] was in control. [Winter] was -- you know, you had to know [Winter. Winter] was the boss. [Winter] wanted things done the way he wanted them done. It was his decision [to call Delaney]."

Delaney arrived at the hospital shortly after the call and saw that although Winter was in poor physical shape, he had all his mental faculties about him and understood perfectly what he was doing and was quite certain about the manner in which he wished to dispose of his assets. Delaney explained that Winter was not in a good way physically due to oxygen issues, but was lucid.

Defendants and JoAnn B. were present when Delaney arrived at the hospital, but Steinberg left when he arrived. Delaney knew Steinberg and Morrison, but had never before met Belmont. Delaney described Belmont as "a very aggressive cousin." Explaining what he meant by "aggressive," Delaney testified that Belmont

> was a very caring cousin. She was there. She was at the hospital, and probably no different than me or anyone else, but she -- I didn't use it in the pejorative sense, but certainly she was very active. . . . And by the way I would use that word for myself as well. I would use it for my sisters as well. . . . Just she was very active.

Winter told Delaney that he wanted a will and directed Delaney to prepare a new will to include Belmont, Morrison, and their respective family members as beneficiaries. Winter also stated he wished to bequeath his antique cars, parts, and tools to plaintiffs Angelo and Philip Giudice. Winter directed Belmont and Morrison to prepare and provide to Delaney a list of family members he wanted included in the will, which they wrote in Winter's and

A-0250-15T4

Delaney's presence. Delaney handwrote the will, which included the bequests to Angelo and Philip Giudice, showed it to Winter, and also read to him the list of names Belmont and Morrison had prepared. Winter acknowledged each name by verbally saying "yes."

Winter named Belmont as executrix. He told Delaney he had trust in Belmont and was confident in her abilities to carry out his wishes. Winter spoke very glowingly to Delaney about Belmont and Morrison, and trusted them to take care of his finances. Winter executed the handwritten will on February 3, 2013, and Belmont and Morrison witnessed his execution.

On the morning of February 4, 2013, Delaney had the handwritten will reduced to a formal will that reflected precisely what Winter had requested and was substantively identical to the handwritten will. Delaney returned to the hospital that morning to have Winter execute the formal will, but saw that Winter was "in bad shape" and in no position to execute any documents. However, when Delaney returned to the hospital that evening, Winter had "miraculously" recovered, so Delaney discussed the formal will and list of beneficiaries with him and he executed the will, with Belmont and Morrison again witnessing the execution. The will expressly revoked all prior wills and codicils.

Within a day after executing the will, Winter realized that he forgot to include Steinberg as a beneficiary. Winter told

Belmont and Delaney that he wanted to add Steinberg as a beneficiary, and instructed Delaney to prepare a new will. Delaney prepared the Will and returned to the hospital on February 7, 2013. Defendants were with Winter at the hospital when Delaney arrived, and he asked them to leave the room. Delaney spoke privately with Winter to ensure he intended to make the bequests stated in the Will and fully understood the document. Delaney explained the Will to Winter and told him that Steinberg was added as a beneficiary. Delaney saw that Winter "clearly was in a condition where he could execute the document, unlike . . . on February the 4th." Upon being completely satisfied the Will reflected Winter's intention and that Winter fully understood it, Delaney had Winter execute it in the presence of his wife and Morrison. The Will expressly revoked all prior wills and codicils. Delaney sent or gave the Will to Winter, and they later talked about it when Winter went to Delaney's home on March 16, 2013.

Regarding Winter's testamentary capacity, Delaney certified: "There is no doubt in my mind that [Winter] was of sound mind at the time he executed his Will, knew what he was signing, knew who his beneficiaries were, and that the Will he asked me to draft clearly reflected his intent and his wishes." Delaney testified at deposition: "I've dealt with people enough to know whether someone is lucid and competent. [Winter] clearly was in a

condition where he could execute the document, unlike when I went there on February [4, 2013]."

Plaintiffs admitted Steinberg was not aware of Winter's 1999 will or that Winter had executed the three wills in February 2013. They also admitted Steinberg had no input into the Will, made no recommendations concerning its content, and did not learn he was a beneficiary under the Will until late May 2013.

Winter recovered, was released from the hospital in late February 2013, and received outpatient chemotherapy. He resumed his normal activities, including shopping and driving, and also had "very extensive" involvement in a complicated real estate transaction. When plaintiff JoAnn Giudice visited Winter at his home in March 2013, she saw he was physically weak, but did not appear to have any mental or cognitive deficiencies.

Winter had instructed Delaney to prepare a power of attorney naming Morrison and Steinberg as power of attorney, and made very clear to Delaney that he wanted them to have power of attorney. Winter also instructed Delaney to prepare an advance directive for health care naming Belmont and JoAnn B. as his health care proxies.

Delaney prepared the documents and Winter signed them at Delaney's home on March 16, 2013. Delaney testified that Winter had "made a miraculous comeback" and "was fully competent and conversant, and knew exactly and precisely what he wanted to do

at that time.  [Belmont] was not even present at the time. . . . [Winter] was lucid and of sound mind when these documents were executed on March 16, 2013."  Delaney specifically asked Winter if he wanted to make any changes to the Will, and Winter said he did not.  Delaney certified that:

> Had [Winter] wished to change his Will after it was executed in the hospital on February 7, 2013, and during the more than four months between that time and his death in June of that year, he most assuredly would have done so, either before or after the March 16, 2013 visit when he had me prepare the Power of Attorney and Health Care Proxy.  This simply did not occur.

Delaney testified that "in March it was clear and unambiguous that [Winter] was satisfied with his Will."  He also testified that although Lorraine told him Winter wanted to make changes to the Will, and there was a "piece of paper" to that effect, which was lost, Winter never confirmed this or contacted him to make any changes to the Will.

Defendants spent almost every day with Winter from the time he became ill, and cared for him until he died.  In mid-April 2013, Winter suffered a significant setback in his health and was hospitalized in late May 2013.  He died on June 13, 2013.

Plaintiffs challenged the Will based on undue influence.  On January 12, 2015, the court ordered plaintiffs to serve expert reports by March 30, 2015, and extended discovery to April 15,

2015. Discovery had long-ended when, on June 3, 2015, plaintiffs filed a motion to amend the complaint to add claims of mistake, lack of testamentary capacity, and "Forgery With Respect to [Winter's] Pension[,]" and on June 5 and 18, 2105, they served expert reports. Defendants then filed motions for summary judgment and to strike the expert reports, and plaintiffs filed a cross-motion, seeking to shift the burden of proof to defendants on the issue of undue influence.

The motion judge denied plaintiffs' motion to amend the complaint, finding no evidence that Winter lacked testamentary capacity at the time he executed the Will, and no evidence of mistake or fraud. After making these findings, the judge advised the parties that during the year 2000, he was a partner at the law firm of Cooper, Rose & English, where Delaney was also a partner. Delaney was associated with a different law firm at the time Winter executed the Will. The judge afforded the parties the opportunity to object, but no one objected.

The judge then addressed the summary judgment motions. The judge found there was no confidential relationship between Winter and defendants and nothing to suggest there were suspicious circumstances. The judge determined the uncontroverted facts established that Winter was competent when he executed the Will; had resumed his normal life and engaged in business transactions

after executing the Will; and never sought to change the Will. The judge concluded that Winter was not under any undue influence when he executed the Will and even if he was, he ratified the Will by his conduct thereafter.

## II.

Plaintiffs first contend the judge abused his discretion in not granting leave to amend the complaint. We disagree.

"Rule 4:9-1 requires that motions for leave to amend be granted liberally" and that "the granting of a motion to file an amended complaint always rests in the court's sound discretion." Kernan v. One Washington Park Urban Renewal Assocs., 154 N.J. 437, 456-57 (1998). The exercise of discretion requires a two-step process: whether the non-moving party will be prejudiced, and whether granting the amendment would nonetheless be futile. Notte v. Merchs. Mut. Ins. Co., 185 N.J. 490, 501 (2006). "Courts are thus free to refuse leave to amend when the newly asserted claim is not sustainable as a matter of law." Interchange State Bank v. Rinaldi, 303 N.J. Super. 239, 256-57 (App. Div. 1997) (quoting Mustilli v. Mustilli, 287 N.J. Super. 605, 607 (Ch. Div. 1995)). "It is well settled that an exercise of that discretion will be sustained where the trial court refuses to permit new claims and new parties to be added late in the litigation and at a point at which the rights of other parties to a modicum of expedition will

be prejudicially affected." Murray v. Plainfield Rescue Squad, 418 N.J. Super. 574, 591 (App. Div. 2011) (citation omitted), rev'd on other grounds, 210 N.J. 581 (2012). We discern no abuse of discretion in the denial of plaintiffs' motion to amend the complaint.

Plaintiffs filed their motion to amend late in the litigation, and well after the close of discovery. To support their lack of testamentary capacity claim, they relied on expert reports that were not properly before the court, as the reports were served in violation of the January 12, 2015 order, and plaintiffs never moved to extend discovery to permit late service. In any event, the experts did not opine that Winter lacked testamentary capacity at the time he signed the Will; they merely opined he "had diminished capacity and was subject to undue influence due to his severe disabilities." Because there was no evidence that Winter lacked testamentary capacity at the time he executed the Will, plaintiffs' lack of testamentary capacity claim was not factually or legally sustainable.

Plaintiffs' mistake claim lacks factual and legal support as well. Plaintiffs alleged there was a mistake in the content of the Will. A mistake concerning the content of a will is known as "probable intent." "The doctrine permits the reformation of a will in light of a testator's probable intent by 'searching out

the probable meaning intended by the words and phrases in the will.'" In re Estate of Flood, 417 N.J. Super. 378, 381 (App. Div. 2010) (quoting Engle v. Siegel, 74 N.J. 287, 291 (1977)), certif. denied, 206 N.J. 64 (2011). "[E]xtrinsic evidence may be offered not only to show an ambiguity in a will but also, if an ambiguity exists, 'to shed light on the testator's actual intent.'" Ibid. (quoting Wilson v. Flowers, 58 N.J. 250, 263 (1971)). "Where the doctrine has been used it has been done only with caution and to clarify ambiguities in a will[.]" In re Estate of Gabrellian, 372 N.J. Super. 432, 442 (App. Div. 2004), certif. denied, 182 N.J. 430 (2005).

There are no ambiguities in the Will. The Will is clear and unambiguous as to Winter's beneficiaries, and there is no competent extrinsic evidence that would render its terms ambiguous. Winter directed preparation of the list of beneficiaries, the list was read to him, and he acknowledged each name by verbally saying "yes." After executing the Will, Winter was fully competent. He stated he wished to make no changes to his Will, and never contacted Delaney to change the beneficiaries. The record does not support plaintiffs' claim that Winter made a mistake in his beneficiary designations.

Plaintiffs' "Forgery With Respect to Pension" claim also lacks factual and legal support. Plaintiffs asserted that someone

A-0250-15T4

forged a State of New Jersey, Division of Pensions and Benefit designation of beneficiary form for Winter's pension, which named Morrison as the beneficiary of Winter's pension. However, Morrison was not designated as the beneficiary of Winter's pension; she was designated as the beneficiary of his life insurance, and did not receive Winter's pension benefits. More importantly, there is no evidence of a forgery. That Morrison could not confirm it was Winter's signature on the form does not prove forgery.

## III.

Plaintiffs next challenge the judge's grant of summary judgment. They argue there was a confidential relationship between Winter and defendants and suspicious circumstances, and the judge erred in failing to shift the burden of proof to defendants.

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016) (citation omitted). Thus, we consider, as the trial judge did, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995)). Summary judgment must be granted "if the pleadings, depositions,

answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Templo Fuente, supra, 224 N.J. at 199 (quoting R. 4:46-2(c)). "[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome the motion." Puder v. Buechel, 183 N.J. 428, 440-41 (2005) (citations omitted). Applying the above standard, we discern no reason to reverse the grant of summary judgment.

"[I]t is generally presumed that 'the testator [is] of sound mind'" to execute a will. Haynes v. First Nat'l State Bank of N.J., 87 N.J. 163, 175-76 (1981) (quoting Geller v. Livingston, 5 N.J. 65, 71 (1950)). That presumption can be overcome, however, upon a showing of undue influence. Id. at 176. "[U]ndue influence is a mental, moral, or physical exertion of a kind and quality that destroys the free will of the testator by preventing that person from following the dictates of his or her own mind as it relates to the disposition of assets[.]" In re Estate of Folcher, 224 N.J. 496, 512 (2016) (alteration in original) (quoting In re Estate of Stockdale, 196 N.J. 275, 302-03 (2008)). As we have held:

> Undue influence is exerted where a testator
> is coerced to do that which he would not have
> done if left to himself, or where there is

> importunity which cannot be resisted and is
> yielded to for the sake of peace. . . . The
> clarifying test of the matter . . . is whether
> the testator's mind, when he made the will,
> was such that, had he expressed it, he would
> have said: "This is not my wish, but I must
> do it."
>
> [In re Estate of Weeks, 29 N.J. Super. 533,
> 542 (App. Div. 1954) (citations omitted).]

The will challenger normally bears the burden of establishing undue influence in execution of a will. Ibid. However, "[w]hen there is a confidential relationship coupled with suspicious circumstances, undue influence is presumed and the burden of proof shifts to the will proponent to overcome the presumption." Folcher, supra, 224 N.J. at 512 (alteration in original) (quoting Stockdale, supra, 196 N.J. at 303). The party defending the will overcomes the presumption of undue influence by demonstrating that the preponderance of the evidence reveals undue influence did not taint the will. Ibid.

A confidential relationship "generally 'encompasses all relationships whether legal, natural or conventional in their origin, in which confidence is naturally inspired, or, in fact, reasonably exists.'" Ibid. (quoting Pascale v. Pascale, 113 N.J. 20, 34 (1988)). "In general, there is a confidential relationship if the testator, 'by reason of . . . weakness or dependence, reposes trust in the particular beneficiary, or if the parties

A-0250-15T4

occupied a relation[ship] in which reliance [was] naturally inspired or in fact exist[ed].'" Stockdale, supra, 196 N.J. at 303 (alteration in original) (quoting In re Hopper, 9 N.J. 280, 282 (1952)). A "confidential relationship" exists when circumstances make it certain that the parties do not deal on equal terms, but on one side there is an overmastering influence, or, on the other, weakness, dependence or trust justifiably reposed. In re Estate of Hopper, 9 N.J. 280, 282 (1952).

"Suspicious circumstances" are those circumstances that "require explanation." Haynes, supra, 87 N.J. at 176 (quoting In re Rittenhouse's Will, 19 N.J. 376, 379 (1955)). "Suspicious circumstances . . . need only be slight." Stockdale, supra, 196 N.J. at 303 (citation omitted).

We disagree there was no confidential relationship between Winter and defendants. Defendants had close familial and personal relationships with Winter, and he trusted them and depended on them during his illness to assist with his medical, personal, and financial affairs. This was sufficient to establish a confidential relationship.

Arguably, there were suspicious circumstances, as defendants were present when Winter called Delaney to the hospital to prepare a new will. However, there was no evidence of coercion or mental, moral, or physical exertion of any kind by defendants that

destroyed Winter's free will to follow the dictates of his own mind as it related to the disposition of his assets. Winter was lucid when he executed the Will and the decision to do so was his and his alone. The Will reflected Winter's intent as to the disposition of his assets, and there is no evidence to the contrary. The preponderance of the evidence reveals undue influence did not taint the Will. Accordingly, summary judgment was properly granted.

## IV.

Lastly, plaintiffs argue the judge should have drawn an adverse inference against defendants; Winter revoked the Will or prepared a holographic codicil; and the judge should have recused himself because of the appearance of impropriety. We have considered these arguments in light of the record and applicable legal principles, and conclude they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). However, we make the following brief comments.

Plaintiffs never moved before the judge for his recusal. See Magill v. Casel, 238 N.J. Super. 57, 63 (App. Div. 1990) (requiring a motion to "be made to the judge sought to be disqualified") (citing R. 1:12-2; N.J.S.A. 2A:15-49). Because plaintiffs never moved for recusal, the issue is waived and not preserved for appeal.

18                                                          A-0250-15T4

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION